Filed 5/1/25  L.A. Parks Alliance v. L.A. County Metro. Transportation Auth. CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| LOS ANGELES PARKS ALLIANCE et al., | B340838, B340931 |
| Plaintiffs and Appellants, | Los Angeles County Super. Ct. Nos. 24STCP00944, 24STCP00965 |
| v. | |
| LOS ANGELES COUNTY METROPOLITAN TRANSPORTATION AUTHORITY, | |
| Defendant and Respondent; | |
| AERIAL RAPID TRANSIT TECHNOLOGIES, LLC, | |
| Real Party in Interest and Respondent. | |

APPEALS from a judgment of the Superior Court of Los Angeles County, Maurice A. Leiter, Judge.  Reversed with directions.

Law Office of John P. Given and John P. Given for Plaintiff and Appellant Los Angeles Parks Alliance.

Carstens, Black & Minteer, Douglas P. Carstens, Michelle N. Black and Sunjana Supekar for Plaintiff and Appellant The California Endowment.

Los Angeles County Counsel, Dawyn R. Harrison, Charles M. Safer, Ronald W. Stamm; Remy Moose Manley, Tiffany K. Wright and Laura M. Harris for Defendant and Respondent.

Latham & Watkins, James L. Arnone, Benjamin J. Hanelin and Samantha K. Seikkula for Real Party in Interest and Respondent.

---

This case arises from the environmental review of a proposed project to create a permanent transit connection between Los Angeles Union Station and Dodger Stadium via an aerial gondola system running through parts of downtown Los Angeles (the Project). After receiving a proposal for the Project from Real Party in Interest Aerial Rapid Transit Technologies, LLC (ARTT), the Los Angeles County Metropolitan Transportation Authority (Metro) conducted the environmental review as lead agency under the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.).[1] Metro ultimately certified an Environmental Impact Report (EIR) and approved the Project, finding its anticipated benefits

---

[1] Statutory references are to the Public Resources Code, unless otherwise stated. We refer to Metro and ARTT collectively as respondents.

outweighed the significant and unavoidable noise impacts the Project would have on the surrounding environment during its two-year period of construction. This litigation followed.

Petitioners Los Angeles Parks Alliance (LAPA) and The California Endowment (TCE) appeal a judgment denying their petitions for a writ of mandate directing Metro to vacate its certification of the EIR and approval of the Project. They contend Metro was not the proper lead agency under CEQA; the EIR failed to analyze environmentally significant future property development at Dodger Stadium; the EIR failed to analyze the Project's potentially significant land use impacts on the Los Angeles State Historic Park; the EIR failed to analyze the Project's potentially significant aesthetic impacts; the EIR failed to disclose the Project's adverse health effects stemming from its significant and unavoidable construction noise impacts; the EIR failed to analyze feasible measures to mitigate the Project's significant construction noise impacts; the EIR failed to analyze environmentally superior alternatives to the Project; and Metro failed to provide legally mandated notices to a trustee agency resulting in a prejudicial subversion of CEQA's public comment and consultation provisions.

We find most of these contentions unpersuasive. We do, however, agree with petitioners that Metro's analysis of measures to mitigate the Project's significant construction noise impacts was inadequate and the agency prejudicially abused its discretion by failing to engage in timely and sufficient efforts to consult with a state agency having jurisdiction by law over natural resources held in trust for the people of this state. We therefore reverse the judgment with directions to issue the writ.

3

## BACKGROUND

Because many of the relevant facts are detailed and specific, they are best understood in the context of the legal issues presented. We will set forth those facts in our discussion. Here, we provide only a general overview of the background to this sprawling dispute.

**1.** ***The Proposed Project***

In April 2018, the project sponsor ARTT approached Metro's Office of Extraordinary Innovation with a proposal to finance, design, construct, operate, and maintain what was framed as an innovative, zero-emission solution to address traffic congestion and improve air quality in the neighborhoods surrounding Dodger Stadium.[2]

The proposed Project aims to create a permanent transit connection between Los Angeles Union Station (LAUS) and Dodger Stadium via an aerial tri-cable gondola system, while also providing transit access to surrounding communities, including Chinatown, Mission Junction, Los Angeles State Historic Park, Elysian Park, and Solano Canyon.[3] In addition to providing a zero-emission transit option powered by renewable

---

[2] Metro established the Office of Extraordinary Innovation to "receive and act upon innovative ideas from the private sector" helping to "bring new mobility service offerings to market."

[3] Aerial gondola systems are classified based on the number of cables (ropes) used in their operation. The proposed Project would use a detachable "3S" system, which relies on three steel cables to support and move the cabins. The tri-cable technology is comprised of two stationary cables (track ropes) that provide support for the running wheels of the cabins, and a third cable (haul rope) that circulates continuously around the system.

energy, the Project endeavors to curb greenhouse gas emissions by reducing vehicular congestion in and around Dodger Stadium and on neighborhood streets, arterial roadways, and freeways. The system would operate daily to serve existing residents, workers, park users, and visitors to Los Angeles.

The Project's proposed 1.2-mile alignment consists of suspended cables and gondola cabins, three passenger stations, a non-passenger junction, and three cable-supporting towers. Most of these components would be located in a public right-of-way, or on publicly owned property. The proposed alignment would begin at the Alameda Station adjacent to LAUS and El Pueblo de Los Angeles (El Pueblo). It would follow Alameda Street and then continue along Spring Street in a northeasterly direction through the community of Chinatown to the Chinatown/State Park Station—an intermediate station at the southernmost corner of the Los Angeles State Historic Park. From there, the alignment would continue northeast over the western edge of the state park and the Los Angeles County Metro L Line (Gold Line) to the Broadway Junction—a non-passenger junction at the intersection of North Broadway and Bishops Road. The alignment would then turn and continue northwest following Bishops Road toward its terminus at the Dodger Stadium Station in the Elysian Park community.

Gondola cabins suspended from cable ropeways would hold 30 to 40 passengers. During operations, the cabins would travel on a continuous loop between the Alameda Station and the Dodger Stadium Station at an approximate speed of 13.4 miles per hour. The moving cabins would be spaced approximately 450 feet from one another, with headways of approximately 23 seconds, during peak operations. Cabins would pass through

passenger stations at roughly one foot per second (less than one mile per hour) to allow for loading and unloading of passengers. After the cabins pass through the loading/unloading zones, the doors would close and the cabins would accelerate to match the line speed of the haul rope before reattaching. The Project is anticipated to have a maximum capacity of approximately 5,000 people per hour per direction, with a travel time from LAUS to Dodger Stadium of approximately seven minutes.

**2.     *The Environmental Review***

In October 2020, Metro, acting as lead agency for the Project's environmental review, issued a notice of preparation to notify agencies, organizations, and individuals that Metro planned to prepare a draft EIR for the Project. A 45-day public comment period followed, during which Metro held a public scoping meeting and received comments on the scope and content of the draft report.

In October 2022, Metro published the draft EIR. The report found the Project would result in "significant and unavoidable" impacts from construction noise and construction vibration, even with the implementation of all feasible mitigation measures. Impacted "noise-sensitive receptors" within 500 feet of construction activities would include single- and multi-family residential units, institutions, schools, a day care center, the Los Angeles State Historic Park, and El Pueblo. Although construction hours would "vary to meet special circumstances and restrictions," Metro reported they generally would be "consistent with the [City of Los Angeles's] allowable construction hours of Monday through Friday between 7:00 a.m. to 9:00 p.m. and Saturdays and National Holidays between 8:00 a.m. to 6:00 p.m." The agency anticipated construction would take approximately

25 months to complete. The report did not identify any other significant impacts that could not be feasibly mitigated.

Metro released the draft EIR for a 90-day public review period ending on January 17, 2023. During that time, the agency held two informational workshops and four public hearings, and it received over 1,100 comments on the draft report.

In December 2023, Metro published the final EIR. The final report responded to comments received during the public comment period and included a series of topical responses addressing, among other issues, Metro's role as the lead agency and its consultation with responsible agencies, the Project's alternatives analysis, mitigation measures, the Project's definition and scope, and land use impacts on the Los Angeles State Historic Park.

On February 22, 2024, Metro's Board certified the EIR, adopted a mitigation monitoring and reporting program, adopted CEQA findings and a statement of overriding considerations, and approved the Project.

3. ***The Trial Court Proceedings***

In March 2024, petitioners LAPA and TCE filed separate petitions for a writ of mandate against Metro, each alleging a single cause of action for violation of CEQA. The petitions challenged Metro's certification of the EIR and approval of the Project, and prayed for a writ directing the agency to vacate these official acts.

The trial court denied the petitions and entered judgment on September 6, 2024.[4] Petitioners filed timely notices of appeal.

---

[4] We do not summarize the trial court's reasoning, as it has no bearing on our independent review of the issues presented in the petitions and this appeal. "An appellate court's review of

**DISCUSSION**

## 1. *Governing Law and Standard of Review*

CEQA "seeks to ensure that public agencies will consider the environmental consequences of discretionary projects they propose to carry out or approve." (*Stockton Citizens for Sensible Planning v. City of Stockton* (2010) 48 Cal.4th 481, 488; see also *Friends of College of San Mateo Gardens v. San Mateo County Community College Dist.* (2016) 1 Cal.5th 937, 944 (*San Mateo Gardens*).) "At the 'heart of CEQA' [citation] is the requirement that public agencies prepare an EIR for any 'project' that 'may have a significant effect on the environment.' " (*San Mateo Gardens*, at p. 944; *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 392 (*Laurel Heights*); § 21151, subd. (a); see §§ 21080, subd. (a), 21100, subd. (a); Guidelines, § 15003, subd. (a).)[5] Our Supreme Court

---

the administrative record for legal error and substantial evidence in a CEQA case, as in other mandamus cases, is the same as the trial court's: [t]he appellate court reviews the agency's action, not the trial court's decision; in that sense appellate judicial review under CEQA is de novo." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 427 (*Vineyard*).)

[5]     All references to "Guidelines" are to the CEQA Guidelines in title 14 of the California Code of Regulations, which implement the provisions of CEQA. (Cal. Code Regs., tit. 14, § 15000 et seq.) The Guidelines state that they are "binding on all public agencies in California." (Guidelines, § 15000.) Although our Supreme Court has " 'not [yet] decided . . . whether the Guidelines are regulatory mandates or only aids to interpreting CEQA,' " the court has nevertheless declared that "the Guidelines are owed deference insofar as they reflect the agency's specialized knowledge and expertise and were adopted through a process of

has described the EIR as an " 'environmental "alarm bell" ' " that " 'alert[s] the public and its responsible officials to environmental changes before they have reached ecological points of no return.' " (*Laurel Heights,* at p. 392.)

An EIR is " 'an informational document.' " (*Laurel Heights, supra,* 47 Cal.3d at p. 391, quoting § 21061.) Its purpose is " 'to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project.' " (*Laurel Heights,* at p. 391, quoting § 21061; see also Guidelines, § 15003, subds. (b)–(e).) By doing so, the EIR is also meant "to demonstrate to an apprehensive citizenry that the agency has in fact analyzed and considered the ecological implications of its action." (*No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 86 (*No Oil*); see also Guidelines, § 15003, subd. (d).) "Because the EIR must be certified or rejected by public officials, it is a document of accountability. If CEQA is scrupulously followed, the public will know the basis on which its responsible officials either approve or reject environmentally significant action, and the public, being duly informed, can respond accordingly to action

_____

notice and public comment under the California Administrative Procedure Act." (*San Mateo Gardens, supra,* 1 Cal.5th at p. 954, citing *Laurel Heights, supra,* 47 Cal.3d at p. 391, fn. 2; *California Building Industry Assn. v. Bay Area Air Quality Management Dist.* (2015) 62 Cal.4th 369, 381.) Thus, the Guidelines are to be afforded " 'great weight' unless a provision is 'clearly unauthorized or erroneous' " under CEQA. (*San Mateo Gardens*, at p. 954.)

with which it disagrees.  [Citations.]  The EIR process protects not only the environment but also informed self-government." (*Laurel Heights,* at p. 392.)

In addressing a legal challenge under CEQA, we review the agency's action for prejudicial abuse of discretion.  An agency abuses its discretion (1) if it fails to proceed in a manner required by law, or (2) if substantial evidence does not support the agency's decision.  (§ 21168.5; *Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 117 (*Save Our Peninsula*).)  " 'Judicial review of these two types of error differs significantly:  While we determine de novo whether the agency has employed the correct procedures, "scrupulously enforc[ing] all legislatively mandated CEQA requirements" [citation], we accord greater deference to the agency's substantive factual conclusions.' "  (*Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 512 (*Sierra Club*).)  Notwithstanding this critical distinction, under either standard of review, "an EIR is presumed adequate [citation], and the [petitioner] in a CEQA action has the burden of proving otherwise."  (*State of California v. Superior Court* (1990) 222 Cal.App.3d 1416, 1419.)  "[T]he reviewing court must resolve reasonable doubts in favor of the administrative findings and decision."  (*Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 514 (*Topanga*); accord *Laurel Heights, supra,* 47 Cal.3d at p. 422.)

For matters subject to our de novo review, in "most cases, the question whether an agency has followed proper procedures will have a clear answer.  Did the agency provide sufficient notice and opportunity to comment on a draft EIR?  [Citations.]  Did the agency omit the required discussion of alternatives?  [Citation.]

As to these legal requirements, the agency has no discretion, and courts will invalidate an EIR that fails to meet them." (*Sierra Club, supra,* 6 Cal.5th at p. 512.)

We afford deference to those decisions that follow from the agency's factual determinations. In reviewing for substantial evidence, we "may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable. [Citation.] A court's task is not to weigh conflicting evidence and determine who has the better argument . . . . We have neither the resources nor scientific expertise to engage in such analysis, even if the statutorily prescribed standard of review permitted us to do so. Our limited function is consistent with the principle that '[t]he purpose of CEQA is not to generate paper, but to compel government at all levels to make decisions with environmental consequences in mind. CEQA does not, indeed cannot, guarantee that these decisions will always be those which favor environmental considerations.' " (*Laurel Heights, supra,* 47 Cal.3d at p. 393.)

"While we are guided by these deferential rules of review, we must also bear in mind that the overriding purpose of CEQA is to ensure that agencies regulating activities that may affect the quality of the environment give primary consideration to preventing environmental damage." (*Save Our Peninsula, supra,* 87 Cal.App.4th at p. 117, citing *Laurel Heights, supra,* 47 Cal.3d at p. 390.) CEQA is the Legislature's declaration of policy that all necessary action be taken " 'to protect, rehabilitate, and enhance the environmental quality of the state.' " (*Laurel Heights,* at p. 392; § 21000.) The integrity of the process is dependent on the adequacy of the EIR. (*Save Our Peninsula*, at p. 117.) " ' "The ultimate decision of whether to approve

a project, be that decision right or wrong, is a nullity if based upon an EIR that does not provide the decisionmakers, and the public, with the information about the project that is required by CEQA." ' " (*Id.* at p. 118.)  When an agency fails to comply with CEQA's informational requirements, it has failed to proceed in "a manner required by law" and has therefore abused its discretion.  (§§ 21168.5, 21005, subd. (a); *Save Our Peninsula*, at p. 118.)  "The ultimate inquiry" in assessing the sufficiency of the EIR is whether the report "includes enough detail 'to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project.' " (*Sierra Club, supra,* 6 Cal.5th at p. 516, quoting *Laurel Heights,* at p. 405.)

In sum, "although the agency's factual determinations are subject to deferential review, questions of interpretation or application of the requirements of CEQA are matters of law." (*Save Our Peninsula, supra,* 87 Cal.App.4th at p. 118; see also *Sierra Club, supra,* 6 Cal.5th at p. 516 ["The determination whether [the EIR] is sufficient is not solely a matter of discerning whether there is substantial evidence to support the agency's factual conclusions."].)  "While we may not substitute our judgment for that of the decision makers, we must ensure strict compliance with the procedures and mandates of the statute." (*Save Our Peninsula*, at p. 118.)

## 2.    *Metro Is the Proper Lead Agency*

To ensure that governmental agencies and the public are adequately informed about the environmental impact of public decisions, CEQA requires a "lead agency" to prepare an EIR "before approving a new project that 'may have a significant effect on the environment.' " (*San Mateo Gardens,*

12

*supra,* 1 Cal.5th at p. 943.)  The lead agency plays a "pivotal role in defining the scope of environmental review, lending its expertise in areas within its particular domain, and in ultimately recommending the most environmentally sound alternative" for accomplishing the project's objectives.  (*Planning & Conservation League v. Department of Water Resources* (2000) 83 Cal.App.4th 892, 904 (*PCL*); see *Friends of the Eel River v. North Coast Railroad Authority* (2017) 3 Cal.5th 677, 713 ["CEQA provides for extensive review on the part of the lead public agency."].)  "The final decision on the merits of a project is the responsibility of the lead agency."  (*Kings County Farm Bureau v. City of Hanford* (1990) 221 Cal.App.3d 692, 711 (*Kings County*).)

Under CEQA, the lead agency is defined as "the public agency which has the principal responsibility for carrying out or approving a project which may have a significant effect upon the environment."[6]  (§ 21067.)  Where, as here, the project is

---

[6]    Because only one public agency can serve as lead agency, CEQA distinguishes lead agencies from responsible agencies. Whereas the lead agency has "principal responsibility" for the project (§ 21067), a " '[r]esponsible agency' " is "a public agency, other than the lead agency, which has responsibility for carrying out or approving a project" (§ 21069).  (See also Guidelines, § 15381; *Planning & Conservation League v. Castaic Lake Water Agency* (2009) 180 Cal.App.4th 210, 239.)

Before completing an EIR, the lead agency must consult with and obtain comments from each responsible agency. (§ 21153, subd. (a).)  The responsible agency, in turn, must make "substantive comments" regarding activities that are within the agency's "area of expertise" or that are "required to be carried out or approved by the agency."  (*Id*., subd. (c); see also Guidelines, § 15096, subds. (b)–(d).)  The responsible agency has authority to mitigate or avoid "direct or indirect environmental

13

to be "carried out" by a "nongovernmental" entity, the Guidelines direct that "the lead agency shall be the public agency with the greatest responsibility for supervising or approving the project as a whole." (Guidelines, § 15051, subd. (b).) This will "normally" be an agency with "general governmental powers, such as a city or county, rather than an agency with a single or limited purpose." (*Id.*, § 15051, subd. (b)(1).) However, although the Guidelines state a "preference" for an agency with general governmental powers, this "preference does not apply if another agency has greater responsibility for supervising or approving the project as a whole." (*Covington v. Great Basin Unified Air Pollution Control Dist.* (2019) 43 Cal.App.5th 867, 883–884 (*Covington*).)

Petitioners contend the City of Los Angeles has the greatest responsibility for Project approvals and therefore it—not Metro—is the proper lead agency for carrying out environmental review under CEQA. They emphasize the City's rights-of-way constitute the primary location in which most Project components will be built, through which the Project's gondola cabins will mostly travel, and where the Project's impacts will be most substantially experienced by residents and visitors.[7] Thus, the draft EIR determined the City's required

_____

effects of those parts of the project which it decides to carry out, finance, or approve." (Guidelines, § 15096, subd. (g)(1).) The agency is also charged with disapproving a project as proposed if it finds there is a feasible alternative or feasible mitigation measure that would substantially lessen or avoid the project's significant environmental effect. (*Id.*, § 15096, subd. (g)(2).)

[7]     Petitioners also note that "the City is listed in the EIR as a monitoring and enforcement agency on all but three of the

14

approvals "could include, but not necessarily be limited" to: (1) execution of a franchise agreement for use of the City's rights-of-way; (2) design approval from the Cultural Affairs Commission; (3) creation of a Specific Plan and Sign District for consistent design and signage requirements; (4) plan approval under an existing conditional use permit for Dodger Stadium; (5) relief from existing specific plans to allow for construction of Project components; (6) execution of a 20-year development agreement between the Project sponsor and the City; and (7) other discretionary and ministerial permits as required for street closures, demolition, grading, etc. In contrast, petitioners argue Metro's responsibility is "comparatively limited," as the agency is responsible for "only three" approvals: (1) review and approval of plans for design, construction, and implementation of the Project under Public Utilities Code section 130252; (2) an easement or other agreement allowing the Project to use part of LAUS; and (3) an encroachment permit or other agreement to allow the Project to cross a Metro rail line.

Respondents counter that Metro's "broad statutory authority over transit development throughout Los Angeles County" makes it the proper lead agency for the Project. They emphasize Metro is charged with planning and operating the

---

required actions listed in the Project's Mitigation Monitoring and Reporting Program." Metro, of course, is also listed as a monitoring and enforcement agency on *all* actions under the program. The fact that Metro shares enforcement duties with another agency is not surprising for a project of this scale and it does not alter Metro's primary responsibility as lead agency with respect to mitigation of the Project's environmental impacts. (See *PCL, supra,* 83 Cal.App.4th at p. 904.)

15

Los Angeles region's transportation system and the agency is statutorily authorized to do " 'any and all things necessary to carry out' " this charge. (Pub. Util. Code, § 130105, subd. (f); see also *id.*, § 130001, subd. (b).) Specifically, respondents argue Public Utilities Code section 130252 requires Metro to approve all plans for public mass transit systems or projects—including the whole of the Project in this case—and to place conditions on the implementation of such projects as necessary.

Petitioners contend the authority vested in Metro under Public Utilities Code section 130252 is limited to ensuring the Project conforms to the relevant regional transportation plan, and thus "does not require Metro to act as lead agency." In support of this statutory construction, petitioners rely exclusively upon extrinsic evidence supposedly showing "Metro's board understood Metro's limited role." As respondents demonstrate, the record is hardly as clear cut as petitioners would have us believe.[8] Be that as it may, the evidentiary conflicts are of little consequence here, as the plain language

---

[8] For example, petitioners cite exchanges at a Metro board meeting between the Los Angeles County Counsel and different board members discussing the agency's role under Public Utilities Code section 130252. While County Counsel acknowledged the City would have significant approval authority over the Project—particularly in the area of land use—counsel was clear that section 130252 vested Metro with broad authority to approve, approve with conditions, or disapprove the plans for the *entire Project* because it proposed to construct and operate a public mass transit system "specifically referenced in the Public Utilities Code." As we will discuss, County Counsel's construction of the statute aligns with the plain meaning of the statutory text.

16

of the statute controls and supports respondents' proffered construction. (See *Regency Outdoor Advertising, Inc. v. City of Los Angeles* (2006) 39 Cal.4th 507, 524 [" ' "If the language of the statute is not ambiguous, the plain meaning controls and resort to extrinsic sources to determine the Legislature's intent is unnecessary." ' "].)

The County Transportation Commissions Act (Pub. Util. Code, § 130000 et seq.) recognizes the public demand for "an efficient public transportation system in the southern California region" and that the "transportation decisionmaking process should be responsive to public values, and provide for the continuing involvement of the public in the preparation, revision, and discussion of transportation plans and services." (*Id.*, § 130001, subds. (a), (g).) Consistent with these legislative findings and goals, the law established Metro as the regional transportation commission for Los Angeles County (*id.,* § 130050.2), with broad authority to "achieve the operation of a coordinated and integrated transportation system which will reduce automobile usage" (*id.,* § 130001, subd. (b)) and to "coordinate the operation of all public transportation services within the county so as to achieve efficient operation thereof" (*id.*, § 130250). Among the powers that Metro is mandated to "reserve to itself exclusively" is the responsibility and authority to establish "overall goals and objectives to achieve optimal transport service for the movement of goods and people on a countywide basis." (*Id.*, § 130051.12, subd. (1).) More generally, and except as otherwise provided, Metro is empowered to do "any and all things necessary to carry out the purposes" of the County Transportation Commissions Act. (*Id.*, § 130105, subd. (f).)

Consistent with the foregoing, section 130252, subdivision (a) of the Public Utilities Code provides that "[a]ll plans proposed for the design, construction, and implementation of public mass transit systems or projects [in Los Angeles County] . . . shall be submitted to [Metro] for approval."[9] The section places only two substantive limits on Metro's approval authority: (1) it carves out "projects, plans, and programs determined by the Department of Transportation to be necessary for the safety and maintenance of the state highway system," over which the county transportation commission "shall have no approval authority" (Pub. Util. Code, § 130252, subd. (b)); and (2) it specifies that "[n]o such plan shall be approved unless it conforms to the appropriate adopted regional transportation plan" (*id.,* § 130252, subd. (a)). Contrary to petitioners' contention, section 130252 does not limit Metro's project approval authority *to* ensuring consistency with the regional transportation plan. Rather, the statute's plain language only prohibits Metro *from* approving a project that is inconsistent with the plan, while otherwise granting Metro discretion to approve, deny, or place conditions on public transportation projects consistent with the agency's broad authority to establish "overall goals and objectives to achieve optimal transport service for the movement of goods and people on a countywide basis." (*Id.*, § 130051.12, subd. (1).)

We agree with respondents that, as the agency statutorily tasked with planning and operating the Los Angeles region's public transportation system, Metro is the appropriate lead

---

[9] Subdivision (c) of section 130252 defines the term " 'plan' " as "a project description and not the detailed project plans, specifications, and estimates."

18

agency for the Project.  Because the Project would commence adjacent to LAUS—Southern California's primary transportation hub—it will necessarily become part of the regional transportation system.[10]  (See Pub. Util. Code, §§ 130001, 130250.)  Thus, state law charges Metro with assessing the Project's broad transit impacts and establishing enforceable conditions proportionate to these impacts, while authorizing the agency to deny operational rights if conditions are not met. (See *id.*, §§ 130051.12, subd. (1), 130252, subd. (a).)  Further, as the agency responsible for the regional transit network, Metro has primary responsibility for implementing the entire Project and integrating it into the transportation system. In view of the Project's regional scope and Metro's statutory purpose, we conclude Metro is "the public agency with the greatest responsibility for supervising or approving the project *as a whole*." (Guidelines, § 15051, subd. (b), italics added.)

Petitioners acknowledge that Metro's regional authority is "not unimportant," but they argue the Project is primarily located in the City and, as such, will require many more approvals from the City's subagencies.  Moreover, they emphasize that the City is an agency with " 'general governmental powers,' which CEQA prefers to an agency with only 'a single or limited purpose' such as Metro." (See Guidelines, § 15051, subd. (b)(1).)  Thus, petitioners contend Metro's "regional expertise and authority is not dispositive" to the lead agency determination.  We agree this single factor is not dispositive; however, as discussed, we find

---

[10]     The record shows LAUS provides local and regional public transit access by connecting several transportation service providers, including LA Metro rail lines, Metrolink, Amtrak, and municipal and private bus operators.

19

Metro's broad authority to approve, oversee, and implement the *entire* Project makes it the appropriate lead agency in this case.

In contrast to Metro's broad statutory authority to approve or disapprove of all "plans proposed for the design, construction, and implementation of public mass transit systems or projects" (Pub. Util. Code, § 130252, subd. (a)), the City's approval authority reaches only discrete aspects of the Project, such as use of the City's rights-of-way or relief from existing specific plans within the City's jurisdiction. Thus, the City is an appropriate *responsible* agency, and Metro was therefore required to consult with the City throughout the environmental review process, while the City, in turn, was required to provide comments and assess alternatives or mitigation measures for significant environmental impacts on "those parts of the project" the City approves. (Guidelines, § 15096, subd. (g); see fn. 6, *ante*.) However, because Metro's approval authority under the County Transportation Commissions Act extends to the Project as a whole, Metro is the proper lead agency under CEQA and the Guidelines.

For the same reason, we conclude the Guideline's preference for an agency with "general governmental powers" (Guidelines, § 15051, subd. (b)(1)) is not dispositive. *Covington* is instructive. There, the petitioners challenged a regional air pollution control district's role as lead agency for the environmental review of a geothermal power plant project in Mono County. (*Covington, supra,* 43 Cal.App.5th at pp. 871–872, 883.) The project's purpose was to produce electricity from clean and renewable resources, thereby supporting the state's goal of reducing greenhouse gas emissions. (*Ibid*.) The petitioners agued the county was the proper lead agency, as it was the

20

agency with " 'general governmental powers,' " while the air pollution control district had only a " 'single or limited purpose.' " (*Id.* at p. 883, quoting Guidelines, § 15051, subd. (b)(1).) The *Covington* court disagreed. Although the county had general governmental powers, its responsibility over the project was limited to approving only a discrete aspect—a conditional use permit for a stretch of pipeline to be placed on property in the county—as most of the project would be built on federal land. (*Covington,* at pp. 883–884.) By comparison, the district was responsible for regulating air quality in the region and thus had broader authority over the whole of the project, including the reduction of greenhouse gases and expected impacts from fugitive gas emissions. (*Id.* at pp. 871–872, 883–884.) "Even though the guidelines state a preference for an agency with general governmental powers," the *Covington* court held that preference did "not apply" because the district had "greater responsibility for supervising or approving the project as a whole." (*Id.* at pp. 883–884.)

We reach the same conclusion here. Although the City will have to make significantly more approvals than the county made in *Covington*, like the county, the City will be required to approve only discrete aspects of the Project. By contrast, Metro is charged under state law with approving the Project as a whole, including the "design, construction, and implementation" of the proposed public transportation system. (Pub. Util. Code, § 130252, subd. (a).) Further, as the Project's goal of creating a mass transit connection between LAUS, Dodger Stadium, and the surrounding community directly implicates Metro's purpose and expertise in the development and administration of the regional public transportation system, we agree with respondents

21

that it "makes sense" for Metro to serve as lead agency.  (See *PCL, supra,* 83 Cal.App.4th at p. 904 [lead agency plays a "pivotal role" by, among other things, "lending its expertise in areas within its particular domain, and in ultimately recommending the most environmentally sound alternative" for accomplishing the project's objectives].)  Metro did not abuse its discretion by serving as lead agency for environmental review of the Project.

### 3.    *The EIR Sufficiently Analyzed Potential Land Use Impacts*

Petitioners contend the EIR failed to analyze the Project's "potentially significant land use" impacts on the Los Angeles State Historic Park (LASHP).  Although the EIR considered the Project's possible conflicts with LASHP's general plan, petitioners maintain this falls short of meeting CEQA's requirements because the report did not sufficiently address state laws governing the authority of the Department of Parks and Recreation (State Parks) to administer, protect, and allow development of LASHP.  As we will explain, by statute, State Parks was required to prepare a general plan for LASHP consistent with the statutory directives that petitioners contend the EIR failed to consider.  (See § 5002.2, subds. (a), (b).)  We presume the agency regularly carried out this duty, just as we presume State Parks is sufficiently familiar with LASHP's general plan to assess relevant conflicts as a responsible agency under CEQA.  (See *Friends of Lagoon Valley v. City of Vacaville* (2007) 154 Cal.App.4th 807, 816 (*Lagoon Valley*); *Gilroy Citizens for Responsible Planning v. City of Gilroy* (2006) 140 Cal.App.4th 911, 918–919 [The relevant inquiry for a reviewing court " 'is not whether the record establishes compliance but whether

the record contains evidence [the agency] *failed* to comply with the requirements of its . . . regulatory program.  In the absence of contrary evidence, we presume regular performance of official duty.' "].)  Based on the record before us, we conclude the EIR sufficiently addressed potential land use impacts on LASHP.

We begin with an overview of land use regulation, the state park system, and CEQA's disclosure requirements regarding land use impacts before turning our focus to the EIR. Broadly speaking, state law requires every local legislative body to adopt "a comprehensive, long-term general plan for the physical development" of land within its jurisdiction.  (Gov. Code, § 65300.)  A "general plan provides a ' "charter for future development" ' " and sets forth the legislative body's "fundamental policy decisions about such development."  (*Lagoon Valley, supra,* 154 Cal.App.4th at p. 815.)  "These policies 'typically reflect a range of competing interests,' " and any subsequent "land use decisions must be consistent with the policies expressed in the general plan."  (*Ibid.*)  As our Supreme Court has explained, " 'the propriety of virtually any local decision affecting land use and development depends upon consistency with the applicable general plan and its elements.' " (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 570–571 (*Goleta Valley*).)

Division 5 of the Public Resources Code establishes our state park system and entrusts it to the jurisdiction of State Parks.  (See § 5001, subd. (b).)  Our Legislature has declared that "California's state parks are a true reflection of our state's collective history, natural and cultural heritage, and ideals."  (*Id.*, subd. (a)(1).)  Under the agency's enabling statutes, State Parks is statutorily directed to "promote and

23

regulate the use of the state park system in a manner that conserves the scenery, natural and historic resources, and wildlife in the individual units of the system for the enjoyment of future generations." (§ 5001.2.) The agency "shall administer, protect, develop, and interpret the property under its jurisdiction for the use and enjoyment of the public," and State Parks is authorized to "establish rules and regulations *not inconsistent with law* for the government and administration of the property under its jurisdiction." (§ 5003, italics added.)

Under this mandate, and consistent with state law governing land use planning, section 5002.2 directs that State Parks "shall prepare a general plan" for every unit of land classified as part of the state park system. (§ 5002.2, subd. (a)(1).) The statute prescribes that the "general plan shall consist of elements that will evaluate and define the proposed land uses, facilities, concessions, operation of the unit, any environmental impacts, and the management of resources, and shall serve as a guide for the future development, management, and operation of the unit." (*Id*., subd. (a)(2).) The law requires State Parks to prepare a "resource element of the general plan" that "shall contain a declaration of purpose, setting forth specific long-range management objectives for the unit consistent with the unit's classification pursuant to Article 1.7 (commencing with Section 5019.50), and a declaration of resource management policy, setting forth the precise actions and limitations required for the achievement of the objectives established in the declaration of purpose." (*Id*., subd. (b).) After State Parks prepares a general plan for a unit under its jurisdiction, the agency must submit the plan to the State Park and Recreation

Commission (State Park Commission) for approval. (*Id.*, subd. (a)(3).)

In June 2015, the State Park Commission adopted the LASHP General Plan, as prepared by State Parks.[11] Consistent with the legislative pronouncements set forth in the Public Resources Code, the General Plan recognizes that "[t]he Mission of State Parks is to protect and enhance the state's natural, scenic, cultural, and ecological resources while providing for public recreation that is compatible with and enhances the public's appreciation of those resources." (LASHP General Plan, p. 114.) The General Plan's stated aim is "to serve as a long-range management tool that provides guidelines for achieving the vision and purpose of [LASHP]," including "to protect, enhance, and interpret the Park's resources while providing opportunities for public use and enjoyment." (*Id.*, pp. 10–11.) Further, to "meet the requirements set forth in [s]ection 5002.2," the General Plan "establishes a set of goals and guidelines which will guide park management and specific project implementation." (*Id.*, p. 118.) These goals and guidelines "address recreational, operational, interpretive, and resource management opportunities and constraints consistent with the classification of a State Historic Park, as set forth in [s]ection

---

[11] All references to "LASHP General Plan" are to the General Plan and Final Environmental Impact Report for the Los Angeles State Historic Park, approved by the State Park Commission on June 10, 2005, at <https://lastatehistoricpark.org/wp-content/uploads/2021/07/LASHP-General-Plan.pdf> [as of April 30, 2025], archived at <https://perma.cc/6PQT-Y3N9>.

25

5019.59 of the Public Resources Code and consistent with [State Park] policies."[12] (*Ibid*.)

We now turn to land use reporting obligations under CEQA and the EIR's discussion of potentially significant impacts stemming from the Project's identified conflicts with the LASHP General Plan. The Guidelines direct that an "EIR shall discuss any inconsistencies between the proposed project and applicable general plans, specific plans and regional plans." (Guidelines, § 15125, subd. (d); see also § 21100, subd. (e).) "The purpose of this requirement is to give the public and decision makers the most accurate and understandable picture practically possible of the project's likely near-term and long-term impacts." (Guidelines, § 15125, subd. (a).) Because an adopted plan may affect existing physical environmental conditions, the EIR typically must address the applicable general, specific, or regional plan as part of the baseline against which the project's likely substantial impacts are to be analyzed. (See *ibid*.)

---

[12] Section 5019.59 describes "[h]istorical units" of the state park system as "nonmarine areas established primarily to preserve objects of historical, archaeological, and scientific interest, and archaeological sites and places commemorating important persons or historic events." As relevant here, the statute prescribes that "[t]he only facilities that may be provided are those required for the safety, comfort, and enjoyment of the visitors, such as access, parking, water, sanitation, interpretation, and picnicking." (§ 5019.59.) It further provides that "[c]ertain agricultural, mercantile, or other commercial activities may be permitted if those activities are a part of the history of the individual unit and any developments retain or restore historical authenticity." (*Ibid*.)

" ' "An action, program, or project is consistent with the general plan if, considering all its aspects, it will further the objectives and policies of the general plan and not obstruct their attainment." [Citation.]' [Citation.] State law does not require perfect conformity between a proposed project and the applicable general plan; '[r]ather, to be "consistent," the [project] must be "compatible with the objectives, policies, general land uses, and programs specified in" the applicable plan.' " (*Lagoon Valley, supra,* 154 Cal.App.4th at p. 817.)

In accordance with the Guidelines, the draft EIR adopted a threshold of significance requiring environmental review and mitigation if the Project could potentially "[c]ause a significant environmental impact due to a conflict with any land use plan, policy, or regulation adopted for the purpose of avoiding or mitigating an environmental effect." In that regard, the draft EIR observed that development along the Project alignment would be "subject to the designations and regulations of several regional and local land use and zoning plans and policies." As relevant here, the report explained that a "portion of the Chinatown/State Park Station would be constructed within the boundaries of the State-owned [LASHP] property," and the Project therefore would be "subject to the development regulations of the [LASHP] General Plan." While the draft EIR identified many consistencies, Metro, in consultation with State Parks, determined the Project would cause a significant environmental impact due to a specific conflict with the "Preferred Park Concept Elements" specified in the LASHP General Plan. However, the agencies determined the impact could be mitigated with an amendment to the General Plan,

27

if approved by the State Park Commission.  The draft EIR explained:

> "The [LASHP] General Plan identifies four types of land uses in its Preferred Park Concept Elements:  Cultural Activities, Recreation Open Space, Garden Open Space, and Natural Open Space.  These land uses do not contemplate a transit station like the Chinatown/State Park Station.  Thus, pursuant to Public Resources Code 5002.2, the proposed Project would require a LASHP General Plan Amendment.  The LASHP General Plan Amendment proposes to amend the Preferred Park Concept Elements to include a 'Transit' land use to allow for the proposed Project's use, as well as to address the state historic park classification as defined in Public Resources Code 5019.59, which permits facilities for the comfort and enjoyment of the visitors, such as access.  The General Plan Amendment is subject to the review and approval by the State Park Commission, which retains its independent authority related to the proposed Project per Public Resources Code 21174."

Following publication of the draft EIR, State Parks provided comments on the report.  Those comments identified additional potential impacts to LASHP, including (1) the taking of approximately 0.21 acres for the physical transit station and up to 1.87 acres that would be restricted by the overhead development and operational rights for the aerial infrastructure;

28

(2) the demolition of park improvements; (3) the removal of trees to accommodate Project infrastructure; (4) impairment of scenic viewsheds and high-value open space; and (5) constraints on the public's ability to use LASHP for special events.

Metro responded to State Park's comments in the final EIR, concluding none of the identified items would constitute a significant impact, as (1) more than 30 of LASHP's 32 acres would not be impacted by the Project's alignment, which would be "above mostly hardscaped, landscaped, and grassy areas along the westernmost edge of the park"; (2) although construction would affect the current location of outdoor seating for some park improvements, accommodations would be made for alternative seating, and the Project did "not propose to demolish" any improvements; (3) all removed trees would be replaced at a minimum 1:1 ratio "as agreed to as part of the approvals required for implementation of the proposed Project from [State Parks], including the General Plan Amendment"; (4) although some views of the downtown Los Angeles skyline would be "partially interrupted," the Project would "not significantly impact views" from LASHP, as the station's location in the southernmost portion of the park would ensure that it did "not block any designated scenic vistas, alter scenic resources, or block panoramic views" and the Project had otherwise been analyzed and tailored for "consistency with Goals and Guidelines from the [LASHP] General Plan that relate to aesthetics"; and (5) the proposed Project would "not significantly reduce the event space area within [LASHP] or limit the number of people that can attend events," as the Project alignment "is largely over a hill where it is difficult to stage special events, and [State Parks] does not include [the alignment's location] in their planned

29

locations for special events." In addition, the EIR reiterated that, although State Parks and Metro had determined inconsistencies between the proposed Project and LASHP's General Plan would result in a significant impact, the agencies had determined that, with implementation of the contemplated General Plan amendment, impacts related to these inconsistencies "would be reduced to less than significant."

Notwithstanding Metro's consultation with State Parks and the final EIR's thorough response to the responsible agency's comments, petitioners contend the report "fails as an informational document" because it "provides no analysis of the comprehensive regulatory regime our Legislature has adopted to protect California's state parks." Petitioners ground their argument on the legislative findings and directives set forth in Division 5 of the Public Resources Code—in particular, the provisions in sections 5001 and 5001.2 directing State Parks to regulate the use of the state parks system to conserve its resources for future generations, and the provisions in sections 5019.53 and 5019.59 describing the improvements that may be constructed within the system's units. We find no deficiency in the EIR's discussion of the Project's land use impacts.

As we have discussed, section 5002.2 required State Parks to formulate a general plan for LASHP and other units under its jurisdiction *consistent with the Public Resource Code's legislative directives*. Specifically, the statute commands State Parks to prepare a general plan to guide "future development, management, and operation of the unit," including "a declaration of purpose, setting forth specific long-range management objectives for the unit *consistent with the unit's classification pursuant to Article 1.7 (commencing with Section 5019.50)*."

30

(§ 5002.2, subds. (a)(2), (b), italics added.)  The LASHP General Plan does this.  Its stated aim is "to serve as a long-range management tool" that establishes guidelines "to protect, enhance, and interpret the Park's resources."  (LASHP General Plan, pp. 10–11; cf. §§ 5001, 5001.2, 5019.91, subd. (b).)  Among other things, the General Plan's guidelines "address recreational, operational, interpretive, and resource management opportunities and constraints *consistent with the classification of a State Historic Park, as set forth in [s]ection 5019.59.*" (LASHP General Plan, p. 118, italics added; see also *id.*, at p. 76.) Thus, in analyzing the LASHP General Plan and the Project's potential inconsistencies with the plan's guidelines, the EIR effectively addressed the Public Resource Code sections that petitioners contend were omitted.  (See, e.g., *Goleta Valley, supra,* 52 Cal.3d at p. 572 [where general plan and local coastal program "address[ed] the very issues" which the petitioner claimed "should have been addressed in the [relevant] EIR," review of planning documents "amply justifie[d]" the lead agency's feasibility assessment for project alternatives].)

The EIR made much the same point in response to petitioner LAPA's comments about State Park's statutory authority.  As the report explained, the draft EIR analyzed the "goals and guidelines of the LASHP General Plan, including those that focus on recreation, aesthetics, interpretation, and access and circulation," and determined the Project "would be consistent with [those] goals and guidelines" and, hence, consistent with the legislative directives set forth in sections 5001 and 5001.2.  Likewise with respect to section 5019.53, the EIR emphasized that the Project would enhance access to LASHP, consistent with the General Plan's stated goal of

31

protecting the park's resources "while providing opportunities for public use and enjoyment." (LASHP General Plan, p. 11; cf. § 5019.53 ["Improvements undertaken within state parks shall be for the purpose of making the areas available for public enjoyment and education in a manner consistent with the preservation of natural, scenic, cultural, and ecological values for present and future generations."].) As for section 5019.59, the EIR again disclosed that State Parks and Metro had found the Project would have a significant impact due to an inconsistency with the General Plan's Preferred Park Concept Elements, but the agencies had determined this impact could be effectively mitigated by amending the General Plan "to include a 'Transit' land use to allow for the proposed Project's use, as well as to address the state historic park classification as defined in Public Resources Code section 5019.59."

The EIR also responded to petitioners' contention that section 5001.65 prohibits State Parks from approving the Project to the extent it would result in the commercial exploitation of LASHP's resources. (See § 5001.65, subd. (a) [with certain exceptions, "[c]ommercial exploitation of resources in units of the state park system is prohibited"].) The report found no significant impact, as it concluded the statutory prohibition covered only "commercial exploitation of tangible resources like minerals and biological resources that can be extracted from certain state lands," while petitioners' broad interpretation would "render moot various State Parks laws and regulations that explicitly allow commercial uses of the state park system." (See, e.g., § 5080.03, subds. (a), (c) [authorizing State Parks to enter concession contracts with corporations and other entities so long as the concession is "compatible" with an approved

32

general plan]; Cal. Code Regs., tit. 14, § 4316 [authorizing State Parks to permit "commercial" filming in a state park unit]; see also LASHP General Plan, pp. 101–102 [establishing guideline for developing "concession opportunities" that are "compatible with the Park's vision, purpose, classification and guidance for aesthetics and resource values"]; *id.,* at p. 102 [establishing guideline for permitting "commercial motion picture filming . . . to ensure compatibility with natural and cultural goals and values and visitor use"].)

On appeal, petitioners explain they have "never held th[e] absurd view" that "no commercial activities would ever be permitted within any state park," but instead maintain section 5001.65 must be harmonized with section 5019.59 to determine which commercial activities may be permitted in a state historic park like LASHP. (See § 5019.59 [providing "[c]ertain agricultural, mercantile, or *other commercial activities* may be permitted if those activities are a part of the history of the individual unit and any developments retain or restore historical authenticity" (italics added)].) As discussed, the LASHP General Plan accounts for LASHP's designation as a historic park under section 5019.59 and, to the extent this designation is inconsistent with the Project, the EIR proposed a mitigation measure to address the inconsistency. No more was required to satisfy CEQA's informational requirements. (See Guidelines, § 15125, subd. (d); *Banning Ranch Conservancy v. City of Newport Beach* (2012) 211 Cal.App.4th 1209, 1234 (*Banning Ranch*) [EIR adequately discussed potential inconsistencies with Coastal Act and proposed mitigation measures, notwithstanding possibility that responsible agency might ultimately "reject the attempted mitigation"]; see also *North Coast Rivers Alliance v. Marin*

33

*Municipal Water Dist. Bd. of Directors* (2013) 216 Cal.App.4th 614, 632–633 (*North Coast*) ["Determining whether a project is consistent with general plan policies is left to the lead agency; '[i]t is, emphatically, not the role of the courts to micromanage . . .' such decisions."].)

Finally, to the extent petitioners contend the EIR failed adequately to address whether State Parks has the authority to approve the Project, we agree with respondents that the issue is beyond CEQA's scope and is not ripe for review. Although they have consulted with Metro as part of the environmental review process, neither State Parks nor the State Park Commission has approved the Project or the proposed LASHP General Plan amendment. (See *Neighbors for Smart Rail v. Exposition Metro Line Construction Authority* (2013) 57 Cal.4th 439, 466 ["speculation a municipality might not agree . . . is not sufficient to show the agency violated CEQA by adopting this mitigation measure"].) If in the future these agencies take actions that petitioners believe are unlawful, petitioners may challenge those actions in court. However, "the issue of whether a proposed project is consistent with [an agency's] general plan [or other governing law] is not a CEQA issue, and therefore the mandate procedures provided for CEQA violations at section 21168.9 do not apply" to decisions made on this basis. (*The Highway 68 Coalition v. County of Monterey* (2017) 14 Cal.App.5th 883, 893; accord *Stop Syar Expansion v. County of Napa* (2021) 63 Cal.App.5th 444, 460.) Rather, " 'the agency's decisions regarding project consistency with a general plan are reviewed by ordinary mandamus.' "[13] (*Highway 68,* at p. 894.)

---

[13] To the extent petitioners contend Metro's proposed mitigation measure fails to address possible significant land use

## 4. *The Project Description Was Complete and No Improper Piecemealing Has Been Established*

Petitioners claim the EIR's analysis of environmental impacts is premised on an inadequate project description that fails to account for "future development at Dodger Stadium" that is a "reasonably foreseeable consequence of the Project." They contend this presents a classic case of "piecemealing," in which "the purpose of the reviewed project is to be the first step toward future development" that has not been subjected to environmental review. (*Banning Ranch, supra,* 211 Cal.App.4th at p. 1223.) Thus, petitioners argue "Metro violated CEQA by certifying an EIR that failed to analyze and mitigate reasonably foreseeable development that would occur as a consequence of the Project."

In support of this contention, petitioners principally rely on two items of evidence: (1) the fact that the northern terminus of the Project at Dodger Stadium is a private parcel co-owned by McCourt Global; and (2) a purported "development agreement" between McCourt Global and the owners of Dodger Stadium that, petitioners say, "requires the parties to make efforts to build

_____

impacts on El Pueblo, we agree with respondents that petitioners waived this argument by failing to raise it administratively. (See *North Coast, supra,* 216 Cal.App.4th at p. 623.) Moreover, as with the LASHP General Plan, our review of the record confirms the EIR analyzed potential land use impacts on El Pueblo, including consistency with the El Pueblo de Los Angeles General Plan, and determined construction and operational impacts would be less than significant. Because the plan incorporates the directives set forth in Division 5 of the Public Resources Code, petitioners have failed to demonstrate this analysis was inadequate.

a mass transit option (such as the Project) to 'facilitate' development by reducing the need for parking."[14]  Petitioners also point to press reports suggesting an "actual plan for development of restaurants, shops, and a museum was proposed, though not built" on the parcel many years earlier, and they say a "proxy" for McCourt Global submitted the "unsolicited proposal" for the Project while the company's website still described the parcel as a "*current* real estate project" three years after that proposal was made.  From this evidence, petitioners argue an inference must be drawn that McCourt Global has a "longstanding desire and economic incentive to develop the land to create year-round activity and revenue" and, therefore, development of the parcel at the northern terminus is a reasonably foreseeable consequence of the Project, demanding environmental review under CEQA.

Respondents characterize petitioners' evidence as little more than "historical proposals and speculative private agreements" that are "too abstract and uncertain to justify inclusion in the Project's environmental review."  They explain the supposed "development agreement" is in fact a Declaration of Covenants, Conditions, Restrictions and Easements for Chavez Ravine (CC&Rs), recorded in 2012, between the new owners of Dodger Stadium and the owner of the adjacent parking lots, and the press reports relate to an obsolete proposal from 16 years ago that was abandoned after 2009.  Respondents argue "CEQA does not require lead agencies to study every preliminary idea or

---

[14]     Frank McCourt owned the Los Angeles Dodgers baseball team between 2004 and 2012.  He is the executive chairman of McCourt Global, a private family company.

speculative notion property owners might consider for their land" and, without a "concrete plan" that Metro could have analyzed as part of the Project, the charge of improper piecemealing is legally unfounded. We agree with respondents.

"There is no dispute that CEQA forbids 'piecemeal' review of the significant environmental impacts of a project." (*Berkeley Keep Jets Over the Bay Com. v. Board of Port Cmrs.* (2001) 91 Cal.App.4th 1344, 1358 (*Berkeley Jets*).) CEQA mandates "that environmental considerations do not become submerged by chopping a large project into many little ones—each with a minimal potential impact on the environment—which cumulatively may have disastrous consequences." (*Bozung v. Local Agency Form. Com'n of Ventura Cty.* (1975) 13 Cal.3d 263, 283–284; accord *Laurel Heights, supra,* 47 Cal.3d at p. 396.) CEQA avoids such a result, in part, by defining the term "project" broadly. (Guidelines, § 15002, subd. (d); *Citizens Assn. for Sensible Development of Bishop Area v. County of Inyo* (1985) 172 Cal.App.3d 151, 165 (*Citizens Assn.*).) " 'Project' means the *whole of an action*, which has a potential for resulting in either a direct physical change in the environment, or a reasonably foreseeable indirect physical change . . . ." (Guidelines, § 15378, subd. (a), italics added.) The term "refers to the activity which is being approved and which may be subject to several discretionary approvals by governmental agencies. The term 'project' does not mean each separate governmental approval." (*Id.*, § 15378, subd. (c).)

"A basic tenet of CEQA is that an environmental analysis 'should be prepared as early as feasible in the planning process to enable environmental considerations to influence project program and design and yet late enough to provide meaningful

information for environmental assessment.' " (*Laurel Heights, supra,* 47 Cal.3d at p. 395, quoting Guidelines, § 15004, subd. (b).) Where " 'future development is unspecified and uncertain, no purpose can be served by requiring an EIR to engage in sheer speculation as to future environmental consequences.' " (*Laurel Heights,* at p. 395.) "On the other hand, the later the environmental review process begins, the more bureaucratic and financial momentum there is behind a proposed project, thus providing a strong incentive to ignore environmental concerns that could be dealt with more easily at an early stage of the project." (*Ibid.*) Balancing these "competing concerns" is crucial to a proper assessment of whether an EIR must include an analysis of a prospective action's environmental impacts. (*Id.* at pp. 395–396.) While the lead agency must have " 'sufficient reliable data to permit preparation of a meaningful and accurate report on the impact' " of future action, its environmental review should not wait only until "definite plans for action" have emerged. (*Id.* at p. 396, quoting *No Oil, supra,* 13 Cal.3d at p. 77, fn. 5.)

Petitioners primarily rely on *Laurel Heights* to support their piecemealing claim. The EIR in *Laurel Heights* defined the project as " 'mov[ing] the School of Pharmacy basic science research units from the [University of California, San Francisco (UCSF)] Parnassus campus to Laurel Heights.' " (*Laurel Heights, supra,* 47 Cal.3d at pp. 389, 393.) The Regents purchased the Laurel Heights facility in 1985, after a long-range development plan for UCSF indicated there were serious space constraints at the Parnassus campus requiring the development of off-campus locations for academic and support activities. (*Id.* at p. 388.) The building consisted of approximately 354,000 square feet, of which

38

only 100,000 square feet was then available for the relocation. The California Department of Transportation (Caltrans) occupied the rest of the building under a lease set to expire in 1990, with an option for an additional five years.  (*Id.* at p. 393.)  The draft EIR nevertheless acknowledged UCSF would occupy the entire Laurel Heights facility once the space became available, with the only uncertainty being the precise use of the additional space. (*Id.* at pp. 396–397.)  A neighborhood association filed a petition for writ of mandate alleging, among other things, the EIR was inadequate because it failed to discuss "the anticipated future uses of the Laurel Heights facility and the likely effects of those uses."  (*Id.* at p. 394; see also *id.* at pp. 387, 389.)

After framing the central question as "what circumstances require consideration in an EIR of future action related to the proposed project" (*Laurel Heights, supra,* 47 Cal.3d at p. 395), our Supreme Court articulated the following standard for resolving this issue:  "We hold that an EIR must include an analysis of the environmental effects of future expansion or other action if:  (1) it is a reasonably foreseeable consequence of the initial project; and (2) the future expansion or action will be significant in that it will likely change the scope or nature of the initial project or its environmental effects.  Absent these two circumstances, the future expansion need not be considered in the EIR for the proposed project."  (*Id.* at p. 396.)  "Under this standard, the facts of each case will determine whether and to what extent an EIR must analyze future expansion or other action."  (*Ibid.*)  "Whether an activity is a project is an issue of law" that reviewing courts decide "on undisputed data in the record on appeal."  (*Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2007) 41 Cal.4th 372, 382.)

Applying the standard to the evidence presented, the *Laurel Heights* court found it "indisputable that the future expansion and general type of future use [was] reasonably foreseeable," and therefore it was "beside the point" that the Regents had yet to decide "*precisely* how they [would] use the remainder of the building." (*Laurel Heights, supra,* 47 Cal.3d at pp. 396–397.) The court concluded the EIR was inadequate because it failed to discuss the "reasonably definite proposals as to future uses of the building" and the likely environmental impacts of those uses. (*Id.* at pp. 397, 399.) Without prescribing the "exact information" that must be included in the EIR, our high court held the university was required to "attempt in good faith to fulfill its obligation under CEQA to provide sufficient meaningful information regarding the types of activity and environmental effects that are reasonably foreseeable when the remainder of the Laurel Heights facility is used by UCSF." (*Id.* at p. 399.)

Contrary to petitioners' contention, *Laurel Heights* is materially different from our case. To begin, the evidence that future expansion was "reasonably foreseeable" in *Laurel Heights* included an explicit acknowledgment in the draft EIR that the university would occupy the entire facility when the remaining space became available. (*Laurel Heights, supra,* 47 Cal.3d at p. 396.) The evidence also showed the university's plans were sufficiently concrete that the school had estimated the number of faculty, staff, and students who would occupy the building before and after the expansion. (*Ibid.*) Moreover, the final EIR and incorporated materials described with specificity how the university planned to use the additional space, explaining in one quoted passage: " '[A]fter consultation with the other schools,

it became clear that *with this move* [i.e., the present project] the best use of the Laurel Heights site we could make, when it becomes fully available to us in 1995, *would be to develop it as a biomedical research facility, with cross-disciplinary programs from all the schools.*' " (*Id.* at p. 397, first italics in original, second italics added.) Meeting minutes likewise "confirmed that *the building will be dedicated primarily to biomedical research*," while disclaiming "plans for extensive student activities or clinical activities to be located at the site after 1995." (*Ibid.*) Thus, the *Laurel Heights* court concluded there was "telling evidence that the University, by the time it prepared the EIR, had either made decisions or formulated reasonably definite proposals as to future uses of the building." (*Ibid.*)

Here, by contrast, petitioners' foreseeability evidence is speculative at best, consisting of the parcel's location, the identity of one of the parcel's co-owners, a purported "development plan" executed by that co-owner, and more-than-a-decade-old press reports about " 'very, very long-term' " plans for stadium development. As noted, the supposed "development plan" is in fact a set of CC&Rs, recorded in 2012, between the new owners of Dodger Stadium and the owner of the adjacent parking lots.[15] Among other things, the CC&Rs acknowledge the parking lots' owner, "in the future, may apply for governmental approvals for future development" of the parcel, which "may include, but shall not be limited to, (i) office buildings, (ii) hotel and exhibition

---

[15] The CC&Rs list the parking lots' owner as Blue Landco LLC and provide for notices to be sent to "Blue Landco LLC c/o The McCourt Group." Press reports cited by petitioners from 2012, when the CC&Rs were recorded, indicate the parking lots were then owned by "an entity half-owned by Frank McCourt."

41

facilities, (iii) residential buildings, (iv) medical buildings, (v) academic buildings, (vi) parking structures, and/or (vii) retail, dining and entertainment facilities." This laundry list of possible future developments comes nowhere near the "telling evidence" of "reasonably *definite* proposals" related to the project that was present in *Laurel Heights*. (*Laurel Heights, supra,* 47 Cal.3d at p. 397, italics added.) The CC&Rs do not merely leave Metro in the dark about "*precisely* how" the parking lots' owner would develop the parcel; they shed no light on whether the future development may occur or what the "general type" of future development would be if it ever did occur. (*Id*. at pp. 396–397.)

The record is similarly silent with regard to meaningful planning or preparation toward implementing any of the disparate developments listed in the CC&Rs and, as Metro rightly noted in the EIR, "neither the Project Sponsor nor any other applicant ha[d] applied for other development unrelated to the existing stadium uses on the Dodger Stadium property." *Laurel Heights* does not "require discussion in the EIR of specific future action that is *merely contemplated or a gleam in a planner's eye*. To do so would be inconsistent with the rule that mere feasibility and planning studies do not require an EIR." (*Laurel Heights, supra,* 47 Cal.3d at p. 398, italics added, citing Guidelines, § 15262; see also *Lake County Energy Council v. County of Lake* (1977) 70 Cal.App.3d 851, 854–855 ["where future development is unspecified and uncertain, no purpose can be served by requiring an EIR to engage in sheer speculation as to future environmental consequences"].) The CC&Rs simply do not offer " 'sufficient reliable data to permit preparation of a meaningful and accurate report on the impact' " of any future action, whatever that future action might be. (*Laurel Heights,*

at p. 396, quoting *No Oil, supra,* 13 Cal.3d at p. 77, fn. 5; see also *Aptos Council v. County of Santa Cruz* (2017) 10 Cal.App.5th 266, 293 (*Aptos*) ["CEQA mandates only the consideration of '*reasonably foreseeable* indirect physical changes in the environment which may be caused by the project,'" and a "'change which is speculative or unlikely to occur is not reasonably foreseeable.'"].)

The press reports predate the CC&Rs and refer to what were plainly inchoate plans by the Dodgers' former owner to "transform the area behind the [stadium] outfield to an entrance promenade featuring restaurants, shops, club offices and a Dodgers museum and [to] add two parking garages to help replace the 2,000 spaces lost to construction." As respondents point out, the undisputed evidence shows these press reports concern a proposal—dubbed the Next 50 Project—that did not proceed beyond a notice of preparation issued in 2008. In 2012, the current owners of the Dodgers purchased the team and the stadium. More than half a decade later, in 2019, those owners obtained approval from the City of Los Angeles for the Dodger Stadium Centerfield Project, which included many of the elements proposed in the abandoned Next 50 Project. Critically, the Dodger Stadium Centerfield Project was completed in 2020 —*prior to* the notice of preparation for the Project here.

Contrary to petitioners' contention, this evidence shows development projects at Dodger Stadium have moved forward *not* as a consequence of the Project, but independently of it. Unlike in *Laurel Heights*, where the evidence proved the university purchased the entire building as part of a plan to "alleviate . . . space constraints" that began with its move into the initial 100,000 square feet of unoccupied space (*Laurel Heights,*

43

*supra,* 47 Cal.3d at pp. 388, 393), the evidence here shows the Project neither depends on future stadium development, nor is it a necessary precursor to future development.[16]  (See *Aptos, supra,* 10 Cal.App.5th at p. 280 [there is "no piecemealing" when projects " 'have different proponents, serve different purposes, or can be implemented independently' "]; see, e.g., *Berkeley Jets, supra,* 91 Cal.App.4th at p. 1362 [no improper piecemealing where evidence showed airport development project did "not depend on a new runway and would be built whether or not runway capacity is ever expanded"]; cf. *San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus* (1994) 27 Cal.App.4th 713, 729–732 [improper piecemealing where construction of additional sewer capacity was a "required" or "crucial" element without which proposed development project could not go forward]; *Tuolumne County Citizens for Responsible Growth, Inc. v. City of Sonora* (2007) 155 Cal.App.4th 1214, 1226, 1231 [agency improperly piecemealed review of shopping center

---

[16]    While not necessary to our resolution of the issue, we agree with respondents that the Project has independent utility distinct from any future development of the stadium parking lots. As its primary purpose, the Project will provide a mass transit connection between the regional transit hub at LAUS, surrounding neighborhoods, and Dodger Stadium, alleviating congestion and associated air pollution, and providing enhanced public access to other regional venues, such as Chinatown, LASHP, and Elysian Park.  Thus, contrary to petitioners' suggestion, the Project's intended utility extends well beyond simply unlocking space in the Dodger Stadium parking lots for future development.  (See *Banning Ranch, supra,* 211 Cal.App.4th at pp. 1223–1224 [listing cases where independent utility demonstrated no piecemealing].)

44

development and street widening where widening of the street was a condition precedent to the development].)

The fact that a purported "proxy" for McCourt Global submitted the Project proposal does not transform what amounts to speculation about past abandoned development plans into substantial evidence of reasonably foreseeable plans for future development.  To be sure, courts have recognized that "independently justified separate projects with different project proponents" tend "*not* [to be] 'piecemealed' components of the same project." (*Communities for a Better Environment v. City of Richmond* (2010) 184 Cal.App.4th 70, 99, italics added; accord *Banning Ranch, supra,* 211 Cal.App.4th at p. 1223.)  But this does not mean the opposite is necessarily true, and petitioners have cited no authority for the proposition that a fuzzy relationship between a project proponent and a potential developer will establish piecemealing when the purported future action is as speculative as it is here.  (See *Berkeley Jets, supra,* 91 Cal.App.4th at pp. 1350–1351, 1357, 1361–1363 ["draft planning documents, prepared over a decade ago," evaluating "feasibility of adding a new runway as part of an effort to develop a 20-year Master Plan" for airport were not sufficiently definite to be considered foreseeable part of airport development plan to accommodate increased air cargo and passenger operations, notwithstanding that the same public agency was responsible for preparation of both].)

Finally, petitioners contend Metro in effect conceded future development of the stadium parking lots was reasonably foreseeable when it adopted a condition of approval for the Project requiring at least 25 percent of the developed land to be dedicated to affordable or supportive housing if the development

45

occurs.  We are not persuaded.  The condition that petitioners rely upon expressly admits that "no such development has been formally proposed," and, as we have discussed, the undisputed evidence plainly shows that no recent steps (i.e., steps within the last decade) have been taken by any of the relevant parties to formulate reasonably definite proposals, much less to prepare for any actual development.  (Cf. *Laurel Heights, supra,* at 47 Cal.3d at p. 397 [finding "telling evidence that the University, by the time it prepared the EIR, had either made decisions or formulated reasonably definite proposals as to future uses of the building"].)  "It is, of course, not necessary that plans for future use be final, or that the precise details of the future use be known, before an analysis of environmental impacts are required.  [Citations.]  However, the mere fact that a lead agency acknowledges that it contemplates such a long-range [future use] is not, by itself, sufficient to conclude that it is a 'reasonably foreseeable consequence of the initial project.' " (*Berkeley Jets, supra,* 91 Cal.App.4th at pp. 1361–1362, quoting *Laurel Heights,* at p. 396.)  Here, the condition of approval is, at most, an acknowledgement by the lead agency that some future development may occur near the Project's northern terminus— without more, it is not sufficient evidence that this speculative possibility is a reasonably foreseeable consequence of the Project.

Because we conclude future development of the stadium parking lots is not a reasonably foreseeable consequence of the Project, we need not address whether such an action would likely change the scope or nature of the Project's environmental effects. (See *Laurel Heights, supra,* at 47 Cal.3d at p. 396 [unless *both* foreseeability *and* significant impact are established, future

46

action "need not be considered in the EIR for the proposed project"].)

**5.** ***The EIR Sufficiently Analyzes the Project's Potential Aesthetic Impacts***

"One of the first steps in the CEQA process is to determine whether the project *may* have a significant effect on the environment." (*Protect the Historic Amador Waterways v. Amador Water Agency* (2004) 116 Cal.App.4th 1099, 1106 (*Amador*).) The term " '[s]ignificant effect on the environment' " is defined as "a substantial, or potentially substantial, adverse change in the environment." (§ 21068; Guidelines, § 15382; *Amador*, at p. 1106.) "Because a particular environmental effect can only be identified as significant after careful consideration, an EIR is required to discuss and analyze a possible impact of the project if there is a fair argument that it constitutes a significant effect." (*Yerba Buena Neighborhood Consortium, LLC v. Regents of University of California* (2023) 95 Cal.App.5th 779, 802 (*Yerba Buena*); *Amador,* at p. 1109; accord *No Oil, supra,* 13 Cal.3d at p. 75 [CEQA "requires the preparation of an EIR whenever it can be fairly argued on the basis of substantial evidence that the project may have significant environmental impact"]; *County of Butte v. Department of Water Resources* (2022) 13 Cal.5th 612, 626–628.)

"One of CEQA's stated purposes is 'to provide the people of this state with . . . enjoyment of aesthetic, natural, scenic, and historic environmental qualities.' " (*Bowman v. City of Berkeley* (2004) 122 Cal.App.4th 572, 584, quoting § 21001, subd. (b).) Thus, "aesthetic issues are among those that are 'properly studied in an EIR.' " (*Bowman,* at p. 584.) The Guidelines "give content to the concept of aesthetics by including the following

questions in the checklist of a project's potential environmental effects: 'Would the project have a substantial adverse effect on a scenic vista?' and 'Would the project substantially degrade the existing visual character or quality of the site and its surroundings?' " (*Ibid.*, quoting Guidelines, Appen. G, questions I(a) and I(c).)  However, "such thresholds cannot be used to determine automatically whether a given effect will or will not be significant.  Instead, thresholds of significance can be used only as a measure of whether a certain environmental effect 'will *normally* be determined to be significant' or '*normally* will be determined to be less than significant' by the agency." (*Amador, supra,* 116 Cal.App.4th at pp. 1108–1109, quoting Guidelines, § 15064.7, subd. (a), italics added.)  Notwithstanding "compliance with a pertinent threshold of significance, the agency must still consider any fair argument that a certain environmental effect may be significant." (*Amador,* at p. 1109.) "Any substantial negative effect of a project on view and other features of beauty could constitute a significant environmental impact" demanding consideration in the EIR.  (*Ocean View Estates Homeowners Assn., Inc. v. Montecito Water Dist.* (2004) 116 Cal.App.4th 396, 401 (*Ocean View*).)

With respect to aesthetic considerations, Metro concluded no mitigation measures were required because the Project would not result in significant impacts to the existing visual character or quality of the Project site and its surroundings.  Petitioners contend Metro abused its discretion in making this finding. They argue the agency failed to follow its "selected methodology" for analyzing potential aesthetic impacts and, in doing so, dismissed "fair arguments" about significant impacts without providing the statement of reasons required under CEQA.

48

(See § 21100, subd. (c); see also Guidelines, § 15128.)  Neither contention has merit.

We begin with Metro's chosen methodology for assessing aesthetic impacts.  As stated in its more than 550-page visual impact assessment for the draft EIR, Metro (through its retained expert analyst) employed a methodological approach that "generally" followed "the guidance outlined in the Guidelines for the Visual Impact Assessment of Highway Projects (2015) published by the Federal Highway Administration (FHWA)."[17] Additionally, and notwithstanding this guidance, the agency's assessment acknowledged that aesthetic perceptions "vary from person to person."  Thus, Metro directed its analyst to "[d]escribe potential viewers and predict viewer response, including exposure and sensitivity" in order to identify visual impacts with "as much objectivity as is practical given the subjective nature of aesthetic perceptions."

Petitioners contend Metro abused its discretion by, in their telling, merely *predicting* viewer responses without collecting "actual viewer preference[s] through viewer workshops to verify the analyst's conclusions."  They emphasize the FHWA guidelines prescribe a "Public Involvement Approach" for "complex and controversial project[s]," which requires the analyst to conduct "visual preference workshops" to ascertain the true

---

[17] Metro included the visual impact assessment as an appendix to the draft EIR, which itself includes a 50-page summary of the lead agency's assessment and findings regarding aesthetic impacts.  The final EIR incorporates these assessments and includes an additional 60-page appendix on aesthetics, as well as responses to comments offered on the draft EIR's aesthetic analysis.

visual preferences of stakeholders rather than relying on the analyst's predictions.[18]  Without these workshops, petitioners argue the EIR's aesthetic analysis is "inadequate," as it fails to provide an "accurate baseline of actual viewer preferences against which the Project's potentially significant aesthetic impacts may be considered."  And, petitioners contend, by "not providing the required information and analysis," Metro violated CEQA's informational requirements.  We disagree.

Notwithstanding petitioners' insistence to the contrary, their argument plainly raises a challenge to the EIR's chosen methodology for assessing aesthetic impacts—a claim of error subject to our substantial evidence standard of review.  It is common in CEQA cases for a project opponent to invite de novo review by claiming the lead agency improperly omitted relevant information from the EIR and, thus, failed to proceed in the manner provided by law.  (See, e.g., *Barthelemy v. Chino Basin Mun. Water Dist.* (1995) 38 Cal.App.4th 1609, 1616–1621 (*Barthelemy*), citing *Kings County, supra,* 221 Cal.App.3d 692;

---

[18]     The FHWA guidelines provide two suggested methods for establishing the visual preferences of viewers.  The first is a "Professional Observational Approach," which directs the analyst to make "assumptions about the visual preferences of viewers based on why people have chosen to occupy a certain location."  The second is the "Public Involvement Approach," which begins with the Professional Observational Approach, but supplements it with "a series of workshops to verify and refine" the analyst's predictions about viewer preferences.  For "more complex and controversial" projects, the guidelines recommend that the analyst "should engage neighbors and travelers in defining a set of visual preferences for the project corridor using the public involvement approach."

*City of Fremont v. San Francisco Bay Area Rapid Transit Dist.* (1995) 34 Cal.App.4th 1780.) However, as the *Barthelemy* court explained in rejecting a similar effort, a "project opponent cannot obtain a more favorable standard of review by arguing that the EIR failed to disclose [relevant] evidence, and therefore the lead agency has not proceeded in a manner required by law; the project opponent must *also* show that the failure to disclose the [omitted] evidence precluded informed decisionmaking or informed public participation." (*Barthelemy,* at p. 1620.) " 'Challenges to an EIR's adequacy usually involve questions such as the proper scope of the analysis, the *appropriate methodology for studying an impact*, the reliability or accuracy of data, the validity of technical opinions, and the feasibility of further studies. These determinations are ultimately based on *factual issues. . . .* The question for a reviewing court should then be limited to *whether the agency's reasons for proceeding as it did are supported by substantial evidence*.' [Citation.] The failure to include information in an EIR normally will rise to the level of a failure to proceed in the manner required by law *only if the analysis in the EIR is clearly inadequate or unsupported.*" (*Ibid.*, italics added.)

Contrary to petitioners' premise, CEQA does not require Metro to follow every directive of the Public Involvement Approach set forth in the FHWA guidelines, even if Metro did commit itself "generally" to follow the "guidance" outlined therein. Rather, as case law has consistently recognized, the lead agency was free to modify this methodology to suit the Project and the prescriptions of our controlling state law, so long as substantial evidence supported the decision to do so. It did here. As Metro explains, while visual preference workshops are one

51

method under the federal guidelines for gathering viewer input, CEQA "has built-in processes for public engagement, including opportunities to comment on aspects like aesthetics during the scoping and Draft EIR comment periods." (See Guidelines, §§ 15063, subd. (g), 15087, 15088, 15105.) The undisputed evidence proves Metro conducted extensive outreach during the notice of preparation scoping period and the draft EIR comment period to inform its aesthetic analysis. In view of that evidence, the agency did not abuse its discretion by declining to conduct the visual preference workshops outlined in the FHWA guidelines. (See, e.g., *Laurel Heights, supra,* 47 Cal.3d at 409 [the relevant inquiry "is not whether the studies are irrefutable or whether they could have been better"—it is "only whether the studies are sufficiently credible to be considered *as part of* the total evidence that supports the [agency's] finding"]; accord *Barthelemy, supra,* 38 Cal.App.4th at pp. 1616–1621.)

Nor are we persuaded that Metro abused its discretion by failing to address fair arguments concerning the Project's potentially significant aesthetic impacts. We are chiefly concerned with petitioners' contention that Metro failed to address comments concerning the "distracting motion of gondola cabins" and the potentially significant impacts this would have on views from LASHP.[19] For example, the California State Park

_____

[19] Petitioners contend the EIR failed to consider other fair arguments regarding potentially significant aesthetic impacts, including viewshed protections provided in the LASHP General Plan and the loss of trees in LASHP relative to the park's design. We need not address these contentions in detail. As respondents demonstrate and our review of the record confirms, Metro did analyze these potential impacts, finding the Project "would be consistent with [the LASHP] General Plan aesthetic resources

Rangers Association commented that the "attention-grabbing movement" of gondola cars was itself "a convincing argument for a significant impact," while the Los Angeles River State Park Partners (a State Parks Cooperating Association for LASHP) expressed concern that the "continuous movement" of the cabins would "degrade" the view of the downtown skyline and "fundamentally alter the sense of peace and quiet in the park." Other comments made the same point, noting that "if gondola cabins are 'constantly moving in and out of view' they will have a greater distracting visual impact" and that the moving cabins would "disrupt park users and residents with . . . visual distractions."  As petitioners correctly observe, given the subjective nature of aesthetic concerns, personal observations and objections such as these can constitute substantial evidence of an adverse environmental impact under CEQA.  (See, e.g., *Ocean View, supra,* 116 Cal.App.4th at p. 402 ["Personal observations" on "subjective" aesthetic issues "can constitute substantial evidence," as determination of whether project component will "be aesthetically pleasing is not the special purview of experts."]; but see *McCann v. City of San Diego* (2021) 70 Cal.App.5th 51, 88 [holding " 'a few stray comments'

goals to protect and enhance scenic viewsheds" and the effect of tree removals would be adequately mitigated by replacing trees "at a minimum 1:1 ratio within the Park or as agreed to as part of the approvals required for implementation of the proposed Project from [State Parks], including the General Plan Amendment."  Petitioners have failed to satisfy their burden to demonstrate the EIR is legally inadequate.  (See *South Orange County Wastewater Authority v. City of Dana Point* (2011) 196 Cal.App.4th 1604, 1612–1613.)

or 'expressions of concern by one or two people' are not enough to constitute substantial evidence" of a significant aesthetic impact].)

As discussed, in preparing an EIR, the lead agency must "consider and resolve every fair argument that can be made about the possible significant environmental effects of a project." (*Amador, supra,* 116 Cal.App.4th at p. 1109.) "An agency must find a 'fair argument' if there is any substantial evidence to support" the conclusion that the project will have a significant impact, "even if there is competing substantial evidence in the record" to support the contrary finding. (*World Business Academy v. State Lands Com.* (2018) 24 Cal.App.5th 476, 499.) If a fair argument is presented, the agency must make findings in the EIR that the identified impact either is, or is not, significant. (*Amador,* at p. 1109.) A finding of insignificance requires only a brief statement of reasons, but a finding of significance triggers the requirement to consider mitigation measures. (See §§ 21002.1, subds. (a), (b), 21100, subds. (b)(3), (c).) A reviewing court owes no deference to the lead agency on its decision to forgo an analysis. (*Taxpayers for Accountable School Bond Spending v. San Diego Unified School Dist.* (2013) 215 Cal.App.4th 1013, 1035.) Our standard of review is de novo. (*Ibid.*; accord *Yerba Buena, supra,* 95 Cal.App.5th at p. 802.)

Respondents do not dispute that the comments cited by petitioners raised a fair argument that the motion of gondola cabins might constitute a significant aesthetic impact on LASHP and views of the downtown skyline from the park. Nevertheless, they insist the EIR satisfied CEQA's informational demands in responding to these concerns, as the report "specifically consider[ed] the cabin's motion and conclude[d] that this

movement would minimize the visual impacts by preventing permanent obstructions of views." Because CEQA requires only "a statement briefly indicating the [lead agency's] reasons for determining that various effects on the environment of a project are not significant" (§ 21100, subd. (c)), respondents maintain the EIR sufficiently addressed concerns that distracting cabin movement itself would be a potentially significant impact. We agree.

*Amador* is instructive. The project in that case proposed to replace a 130-year-old canal with a pipeline, which the lead agency acknowledged would cause reduced surface flows of water into local streams around the canal. (*Amador, supra,* 116 Cal.App.4th at p. 1102.) The EIR, however, stated only that the change in local hydrology was " 'not considered to be a significant hydrological impact *per se*,' " but gave no reason for this conclusion. (*Id.* at p. 1111.) This was an abuse of discretion.[20]

---

[20] The petitioner in *Amador* had argued the lead agency adopted "narrow and irrelevant thresholds of significance" that did not address the seasonal reduction of surface flow in local streams and, thus, allowed the agency to reach the "false conclusion" that modifying the hydrology of local creeks was not a significant adverse environmental change. (*Amador, supra,* 116 Cal.App.4th at pp. 1110–1111.) The *Amador* court found this contention missed the EIR's real deficiency, which was the report's failure to describe "the reasons *why* the Agency found the reduction in stream flow would not be significant." (*Id.* at p. 1111.) Absent the requisite statement of reasons, the reviewing court could not "discern whether the Agency reached its 'less than significant' conclusion regarding the reduction in surface flow of local streams based on substantial evidence in the administrative record or because, as [the petitioner] assert[ed], [the agency] rotely applied standards of significance that did not

55

As the reviewing court explained, CEQA requires a brief statement of reasons "to assure meaningful judicial review" in the event the EIR's insignificance determination is challenged in court. (*Ibid.,* citing *Citizens Assn., supra,* 172 Cal.App.3d at p. 171 ["Mere conclusions simply provide no vehicle for judicial review."].) The agency's "assertion" regarding local hydrology was "not a statement of reasons, but a bare conclusion," which afforded no basis to discern whether the agency reached its " 'less than significant' " finding "based on substantial evidence." (*Amador,* at pp. 1111–1112.)

Critically, the *Amador* court contrasted the EIR's deficient discussion of impacts on local hydrology with the report's statement that "riparian habitat will ' "continue to thrive along local streamcourses if canal leakage is eliminated." ' " (*Amador, supra,* 116 Cal.App.4th at p. 1113.) The court held the latter declaration constituted "a valid statement of reasons" for the agency's finding that the impact on "wildlife resources, including riparian habitat, [would] be less than significant." (*Ibid.*) Although the statement offered few details, it was not the same as the bare conclusion about local hydrology, because a reviewing court could meaningfully address a claim that insufficient evidence supported the agency's finding that riparian habitats would " ' "continue to thrive." ' " (*Ibid.*) This was all CEQA required. (See *id.* at pp. 1112–1113 ["when an agency determines a particular environmental effect of a project is not significant, the EIR does not have to contain a detailed analysis in support of that determination"; rather "all the EIR must

address reduction in stream flow as a potential environmental effect of the project." (*Id.* at pp. 1111–1112.)

56

contain is a 'statement briefly indicating the reasons for' that determination"]; § 21100, subd. (c).)

Here, as with the latter statement in *Amador,* we can readily discern from the EIR why Metro determined the movement of gondola cabins across views of the downtown skyline did not constitute a significant aesthetic impact. Moreover, it is apparent from our review of the report that Metro did not just "rotely" apply its standards of significance, but instead based its insignificance determination on substantial evidence developed in connection with its broader study of potential aesthetic impacts.  (Cf. *Amador, supra,* 116 Cal.App.4th at p. 1112; see also fn. 20, *ante*.)

As part of its aesthetic analysis, the draft EIR studied thirty "key observation points" that Metro determined were "critical or representative of the visual character" of areas along the Project alignment, using "before and after photorealistic and true to scale visual simulations" to show the Project's potential aesthetic impacts.  Of these key observation points, nine simulated views were of or from inside LASHP.  Metro found that certain southwest-facing views of the downtown Los Angeles skyline from LASHP, particularly those close to the proposed Chinatown/State Park Station, would be "partially interrupted" due to the proposed Project.  However, the agency concluded the Project would "not significantly impact views in this area," explaining:  views of the downtown skyline "from most locations in the park" would remain "uninterrupted"; "existing views of downtown from other areas within the park are already interrupted under existing conditions by trees and intervening development"; "the location of the proposed cables and cabins would be adjacent to the existing Metro L Line (Gold) and the

57

associated overhead catenary system"; "the cables have similar characteristics to the overhead power lines that are prevalent in views in this area"; and the "cabins would be constantly moving in and out of view," such that they would only partially interrupt views of the skyline.

In responding to comments about the distracting motion of gondola cabins, the final EIR reiterated and emphasized two evidentiary points identified in support of the draft EIR's insignificance finding: (1) the cabins would be adjacent to the existing Metro L Line (Gold) and the "associated overhead catenary system" that supplies electricity to the moving train cars; and (2) the fact that the cabins would be moving "in and out of view" meant they would not permanently obstruct views from LASHP. In addition, Metro's response referred to Topical Response M, where the report summarized evidence collected regarding "numerous aerial transit systems in other locations around the world that serve as precedents for the proposed Project." Among other things, the topical response cited examples in Mexico City and other Latin American regions where aerial gondola systems had been successfully integrated into "surrounding urban environments," in some cases flying over public parks and in others leading to the construction of new parks in close proximity to gondola stations.

It is clear from Metro's response that the lead agency determined the motion of gondola cabins would not constitute a significant aesthetic impact because views from LASHP already are subject to distracting visual elements (such as the motion of Metro trains and the overhead catenary system) and, given the preexisting urban environment, it was aesthetically superior to have a system with relatively small moving cabins that would

not permanently obstruct views.  In exercising its discretion, a lead agency " 'must necessarily' " weigh competing concerns in " 'distinguishing between substantial and insubstantial adverse environmental impacts based, in part, on the setting.' " (*North Coast, supra,* 216 Cal.App.4th at p. 627.)  Here, the EIR discusses factual evidence supporting Metro's conclusion that the motion of gondola cabins would represent an insignificant aesthetic impact on views from LASHP.  This was sufficient to satisfy CEQA's informational requirements.  (See, e.g., *Clover Valley Foundation v. City of Rocklin* (2011) 197 Cal.App.4th 200, 244 (*Clover Valley*) [although proposed residential development would represent a " 'high level' of change" to visual character of proposed site, EIR sufficiently explained that it did not amount to a significant aesthetic impact "because the area is already a residential area," and, "[b]y containing factual statements addressing why this impact is not significant," EIR satisfied CEQA requirements].)

6.      ***Metro Adequately Discussed Potential Health Consequences Connected to Construction Noise Impacts***

Petitioners contend Metro violated CEQA's disclosure requirements by labeling the Project's construction noise impacts "significant," but then "downplaying and denying" the human health-related effects of these impacts.  Specifically, petitioners argue Metro narrowly focused on federal Occupational Health and Safety Administration (OSHA) and Cal/OSHA standards that are designed only to protect adult workers from hearing loss and, in doing so, failed to disclose how members of the general public would be personally impacted by construction noise levels that could disturb daytime sleep or cause speech interference "with its attendant adverse public health effects."  We reject

59

these arguments. Our review of the record confirms Metro addressed all relevant public comments concerning the possible health consequences of the Project's disclosed significant construction noise impacts, and petitioners' new contentions —raised for the first time in litigation—are barred under the exhaustion doctrine.

Section 15126.2, subdivision (a) of the Guidelines directs that an EIR "shall identify and focus on the significant [environmental] effects of the proposed project," examining "changes in the existing physical conditions in the affected area," and discussing, among other things, "relevant specifics of . . . health and safety problems" caused by the project's environmental effects. (Guidelines, § 15126.2, subd. (a); *Sierra Club, supra,* 6 Cal.5th at p. 520.) As our Supreme Court has explained, this mandate "does not" entail "an in[-]depth risk assessment" of human health effects. (*Sierra Club,* at p. 521.) Rather, with respect to an environmental impact like construction noise, CEQA requires only that "the EIR have made a reasonable effort to discuss relevant specifics regarding the connection between" the "general health effects" associated with particular noise levels and the "estimated amount" of construction noise a project is likely to produce. (*Ibid.*)

As the draft EIR explains, Metro evaluated the Project's anticipated impacts by modeling construction noise levels at representative sensitive receptors (e.g., single-family and multi-family residential areas, schools, and parks) and comparing these values to existing ambient noise levels (i.e., noise levels without construction noise from the proposed Project).[21]

---

[21] The draft EIR explains that the amplitude of pressure waves generated by a sound source determines the loudness

60

Consistent with the Project's urban setting, Metro's analysis found daytime outdoor ambient sound levels at each receptor were high, ranging from 53.6 dBA to 69.8 dBA—roughly equivalent to the noise generated by heavy traffic at 300 feet. Because each phase of construction would involve the use of different types of construction equipment and would, therefore, have its own distinct noise characteristics, the EIR modeled construction noise levels for each Project component during "worst-case construction phases" (i.e., when the loudest mix of construction equipment would simultaneously be in use) and analyzed the predicted "peak-noise levels" at all sensitive receptors within approximately 500 feet of each Project component site.[22] To determine whether construction noise

of that source. Sound pressure levels are typically described using a logarithmic scale in terms of decibels (dB). However, human hearing is limited in the range of audible frequencies as well as in the way it perceives sound pressure levels. Thus, to approximate the response of the human ear, sound levels of individual frequency bands are weighted to coincide with human sensitivity to those frequencies and expressed in units of dBA or an " 'A-weighted' " sound level. A five dBA increase is generally perceived as a distinctly noticeable increase in loudness, while a 10 dBA increase is generally perceived as a doubling of loudness.

[22] The draft EIR explains that Metro selected a 500-foot radius because noise attenuates with distance and the agency calculated that, beyond 500 feet, construction noise levels would be "less than the high daytime ambient noise levels in the Project's urban environment." (Cf. *Sierra Watch v. County of Placer* (2021) 69 Cal.App.5th 86, 107 (*County of Placer*) [EIR deficient where agency selected "arbitrary" 50-foot radius for assessing construction noise impacts, despite "evidence of noise disturbance outside this radius"].)

impacts would be significant, Metro then applied three established thresholds—the Los Angeles CEQA Thresholds Guide, the Los Angeles Municipal Code, and the Federal Transit Administration (FTA) guidelines.

Based on this analysis, Metro determined the Project would result in significant construction noise impacts to different receptors during each phase of construction. The EIR disclosed these findings and the agency's analysis, both narratively and in tables summarizing (1) predicted noise levels during each construction phase at each impacted receptor; (2) the increase in noise level from the existing conditions to the construction conditions; and (3) whether that increase exceeded an applicable threshold and thus constituted a significant impact.

Following publication of the draft EIR, petitioner TCE submitted a comment letter challenging the report for "omit[ting] a discussion of the extensive health impacts of noise exposure, as required by CEQA." Specifically, TCE observed that "[e]xcess noise pollution can cause *hearing damage and loss*," adding that the EIR "must relate *these* health impacts of excessive noise exposure to the Project's significant noise impacts." (Italics added.) In support of its objection, TCE cited guidelines published by the United States Environmental Protection Agency (EPA) recommending that, "to ensure an adequate margin of safety to prevent *hearing loss and damage*," individuals should not be exposed to sound levels greater than 70 dBA over a 24-hour period. (Italics added.) The same EPA guidelines, TCE noted, recommended a "day-night average sound level no greater than 45 dBA for indoors and 55 dBA for outdoors" to "prevent interference with activities and annoyance."

62

TCE also asserted the EIR must evaluate sleep disturbance, quoting a study that explained " 'undisturbed sleep of a sufficient length is needed for *daytime* alertness and performance, quality of life, and health.' " (Italics added.) The comment again referenced the EPA guidelines on environmental noise levels and public health, noting that the federal agency had determined "a *nighttime* portion of a day-night average sound level of approximately 32 dB should protect against sleep interference." (Italics added.) TCE concluded the comment noting the Project would operate "for sporting events that will run as late as midnight or later," and objected to the draft EIR for providing "no analysis of single event *nighttime* noise levels to evaluate these impacts." (Italics added.)

Metro responded to TCE's comments in the final EIR, addressing both specific concerns about potential hearing loss and nighttime sleep disturbance. With respect to hearing loss, the agency analyzed the potential risk under health-based standards established by OSHA and Cal/OSHA, as well as under the EPA guidelines cited in TCE's comment letter. The OSHA standards, the EIR explained, establish that hearing loss or damage can occur when noise exposure exceeds an average of 90 dBA over an eight-hour period. Although Metro had determined modeled peak-noise levels would be significant at certain receptors for all phases of construction, the EIR reported these levels would not exceed the OSHA standards for the sustained eight-hour period that is linked to possible hearing loss.

As for the EPA guidelines, the EIR disclosed that the Project's construction noise levels would be higher than the 70 dBA noise exposure limit at some receptor locations.

63

However, the report explained the EPA's guidance concerned long-term exposure over a 24-hour period for 40 years, while the Project's construction activities were expected to occur over only an approximately eight-hour workday for 25 months. Thus, Metro reported that people in the Project's vicinity would not be exposed to excessive construction noise levels for the long-term period specified in the EPA guidelines to protect against hearing loss or damage.

Finally, addressing the comment about sleep disturbance, the EIR again disclosed that construction noise impacts would be significant during all phases of construction; however, the report explained these activities "would be limited to daytime hours" as mandated under the Los Angeles Municipal Code. Therefore, Metro reported construction noise impacts would not result in nighttime sleep disturbance. The EIR then detailed a study of the Project's operational noise impacts that Metro performed in response to TCE's specific objection about "nighttime noise levels." Based on the results of that study, Metro reported that operational impacts associated with noise from stations, towers, queuing, and cabins would be below ranges established by the EPA for falling asleep (40 dBA) and awakening (70 dBA) inside residential buildings with the windows closed.[23]

Petitioners contend the EIR's analysis of potential health risks stemming from the Project's construction noise impacts was inadequate. They argue the 90 dBA standard established by OSHA to protect the hearing of workers fails to account for

---

[23] Petitioners do not challenge the EIR's analysis of the Project's operational noise impacts.

EPA guidance suggesting that noise levels "below 90 dBA may still be hazardous to health and welfare because they interfere with *sleep and speech* even if such noise may not harm hearing." (Italics added.)  Further, petitioners maintain Metro improperly dismissed TCE's request for a sleep disturbance analysis by assuming that "no daytime sleep occurs."  Respondents contend petitioners waived these new objections about daytime sleep disturbance and health impacts other than hearing loss by failing to raise these issues administratively.  We agree with respondents.

"Exhaustion of administrative remedies is a jurisdictional prerequisite to maintenance of a CEQA action."  (*Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184, 1199 (*Bakersfield*); *North Coast, supra,* 216 Cal.App.4th at p. 624; see also *Abelleira v. District Court of Appeal, Third District* (1941) 17 Cal.2d 280, 293.)  No action or proceeding alleging that an EIR does not comply with CEQA may be brought "unless the alleged grounds for noncompliance . . . were presented to the public agency orally or in writing by any person during the public comment period . . . or before the close of the public hearing on the project before the issuance of the notice of determination."  (§§ 21177, subd. (a), 21167, subd. (c).)

" ' "The essence of the exhaustion doctrine is the public agency's opportunity to receive and respond to articulated factual issues and legal theories before its actions are subjected to judicial review." ' [Citations.]  Comments must express concerns so the lead agency has ' " ' "its opportunity to act and to render litigation unnecessary." ' " ' [Citation.]  'The purposes of the doctrine are not satisfied if the objections are not sufficiently

65

specific so as to allow the Agency the opportunity to evaluate and respond to them.' " (*North Coast, supra,* 216 Cal.App.4th at p. 623.)  Thus, " 'relatively . . . bland and general references to environmental matters' [ ], or 'isolated and unelaborated comment[s]' " will not satisfy the exhaustion requirement. (*Citizens for Responsible Equitable Environmental Development v. City of San Diego* (2011) 196 Cal.App.4th 515, 527.) Rather, " '[t]he "exact issue" must have been presented to the administrative agency.' " (*Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 535 (*City of Orange*).)  "Requiring anything less 'would enable litigants to narrow, obscure, or even omit their arguments before the final administrative authority because they could possibly obtain a more favorable decision from a trial court.' " (*North Coast*, at p. 623.)

"The petitioner bears the burden of demonstrating that the issues raised in the judicial proceeding were first raised at the administrative level." (*Porterville Citizens for Responsible Hillside Development v. City of Porterville* (2007) 157 Cal.App.4th 885, 909.)  "Inasmuch as the issue of exhaustion is a question of law, '[a]n appellate court employs a de novo standard of review when determining whether the exhaustion of administrative remedies doctrine applies.' " (*North Coast, supra,* 216 Cal.App.4th at p. 624.)

As discussed, petitioner TCE submitted a comment letter generally referring to "health impacts from noise exposure"; however, the only *specific* health concern that TCE raised was the connection between "[e]xcess noise pollution" and "*hearing damage and loss*."  (Italics added.)  Because this was the " ' "exact issue" ' " that TCE brought to Metro's attention (*City of Orange, supra,* 163 Cal.App.4th at p. 535), it is no surprise

66

that the agency focused its response on this concern, applying both the health-based OSHA standards and the EPA guidelines "to prevent hearing loss and damage" that TCE cited in its letter. After leading Metro to focus on hearing loss, petitioners cannot object now that the EIR's analysis was insufficient because it did not consider noise levels that, as petitioners put it, "may not harm hearing." This sort of bait-and-switch tactic—whether originally intended by TCE or not—is exactly the sort of stratagem the exhaustion doctrine is meant to discourage. (See, e.g., *City of Walnut Creek v. County of Contra Costa* (1980) 101 Cal.App.3d 1012, 1021 [general arguments about increased density without reference to specific density limitations in county's general plan had effect of turning administrative process into " 'shadow-play,' " and "fact that [petitioner] may not have intended to avoid an administrative determination" did "not negate the policy reasons for refusing to allow it to raise the issue for the first time in the trial court"].)

Petitioners maintain the comment letter's isolated reference to EPA standards to prevent "interference with activities and annoyance" sufficiently raised the issue of "speech interference" and "its attendant adverse public health effects," requiring Metro to discuss the issue and propose specific mitigation measures to address it. Even giving the comment letter a generous reading, we are not persuaded that the mere mention of "activities and annoyance" satisfies the exhaustion doctrine's mandate to identify the *exact* issue that petitioners now raise before this court. Although the EIR did not specifically discuss speech disturbance, the report did address TCE's general comment, explaining that the EPA's recommendation of a day-night average sound level of no greater than 45 dBA indoors and

55 dBA outdoors is "generally applied to impacts from operations and not construction" activities that are temporary.[24]  This response was consistent with the EPA guidelines that TCE referenced, which state that "*[c]ontinued long-term* annoyance is considered to affect individual as well as public health." (Italics added.)  In addition, to help the public understand the potential for interference with daily activities, the EIR included information comparing construction noise levels to the noise generated by common indoor activities, such as normal speech at three feet or running a vacuum cleaner at 10 feet.[25]  This was sufficient to address the general concern raised in TCE's comment letter.  (See *Covington, supra,* 43 Cal.App.5th at p. 879 ["The level of detail in [a] response may correspond to the level of detail in the comment, so that a general response is sufficient to a general comment."]; accord Guidelines, § 15088, subd. (c); see, e.g., *County of Placer, supra,* 69 Cal.App.5th at pp. 107–108 [EIR sufficiently described how construction " 'noise could

---

[24]     The EIR evaluated the Project's operational noise impacts under the EPA standard and determined the Project "would not result in a significant impact when compared to the EPA recommended exterior and interior noise limits to prevent interference with activities and annoyance."  As noted, petitioners do not challenge the EIR's operational noise impacts analysis.

[25]     According to the draft EIR, both indoor activities produce noise levels ranging from 60 dBA to 70 dBA, while a garbage disposal at three feet produces 80 dBA.  This latter level roughly aligns with the FTA guidelines, which establish a threshold of 80 dBA at the exterior of residential properties, churches, schools, and parks for construction activities that will last more than 10 days in a three-month period.

68

affect residents' living patterns, speech, sleep, and health' " by comparing noise levels for daytime and nighttime construction activities to noise levels commonly experienced in a "noisy urban area," a "commercial area," and a "quiet urban area" in daytime].)

We reach the same conclusion regarding the EIR's discussion of sleep disturbance. Petitioners maintain TCE's comment letter "very specifically stated 'the [draft EIR] fails to sufficiently analyze sleep disturbance,' without limiting that comment to nighttime sleep." We disagree. As discussed, the comment letter raised the need for " 'undisturbed sleep of a sufficient length . . . for *daytime* alertness and performance, quality of life, and health' "; it cited EPA guidance observing that "a *nighttime* portion of a day-night average sound level of approximately 32 dB should protect against sleep interference"; and, critically, the letter concluded by noting the Project would operate "for sporting events that will run *as late as midnight or later*," while objecting that the draft EIR provided "no analysis of single event *nighttime* noise levels to evaluate these impacts." (Italics added.) Every specific detail in the letter indicated TCE was concerned about the impact the Project would have on *nighttime* sleep. Indeed, our review of the letter leaves little doubt that TCE's true concern was the Project's *operational* noise impacts on nighttime sleep and the draft EIR's lack of a single-event nighttime noise study to evaluate these impacts. Metro responded to this issue and performed the study that TCE requested. This was sufficient to address the exact issue raised in the comment letter and it satisfied CEQA's directive to examine "*relevant specifics* of . . . health and safety problems" likely to be caused by the Project's environmental effects. (Guidelines, § 15126.2, subd. (a), italics added; see *Sierra Club*,

69

*supra*, 6 Cal.5th at p. 520; cf. *Berkeley Jets, supra,* 91 Cal.App.4th at p. 1382 [EIR inadequate where lead agency ignored expert opinion calling for further evaluation of the impact of single-event noise likely to result from airport operations after proposed expansion].)

Even if petitioners had not failed to raise the issue administratively, we agree with respondents that the EIR was sufficient without a daytime sleep study. " 'It is settled that the [lead agency] is not required to conduct every requested test in order to satisfactorily analyze a potential impact, and "our courts have repeatedly emphasized that an EIR must demonstrate a good faith effort at full disclosure; it does not require perfection, nor exhaustive analysis." ' " (*Tiburon Open Space Committee v. County of Marin* (2022) 78 Cal.App.5th 700, 754 (*Tiburon*); Guidelines, § 15151.) Metro reasonably focused its sleep disturbance analysis on impacts that individuals would experience during nighttime hours because *most people sleep at night* and nighttime sleep patterns are a predictable and significant component of public health. For that reason, it also is no surprise that the scholarship and EPA guidelines cited in TCE's comment letter similarly focused on nighttime sleep, even though there surely are some individuals who sleep at times during the day. "Under CEQA, the question is whether a project will affect the environment of persons *in general*, not whether a project will affect *particular persons*." (*Mira Mar Mobile Community v. City of Oceanside* (2004) 119 Cal.App.4th 477, 492, italics added (*Mira Mar*).) As our Supreme Court has observed, "[a] project opponent . . . can always imagine some additional study or analysis that might provide helpful information. It is not for them to design the EIR. That further study . . . might

be helpful does not make it necessary." (*Laurel Heights, supra,* 47 Cal.3d at p. 415; see also *Gray v. County of Madera* (2008) 167 Cal.App.4th 1099, 1115 [even if feasible, "additional testing is required only if the initial testing is insufficient"].) The EIR's sleep disturbance analysis was adequate.

7. ***Metro Abused Its Discretion by Failing Adequately to Assess Potentially Feasible Measures to Mitigate the Project's Significant Construction Noise Impacts***

" 'The Legislature has declared "it is the policy of the state that public agencies should not approve projects as proposed if there are . . . feasible mitigation measures available which would substantially lessen the significant environmental effects of such projects." ' " (*Residents Against Specific Plan 380 v. County of Riverside* (2017) 9 Cal.App.5th 941, 969.) Accordingly, an EIR must identify and describe all feasible mitigation measures for each significant impact. (Guidelines, § 15126.4, subd. (a); § 21002; *Clover Valley, supra,* 197 Cal.App.4th at p. 244.) In this context, " '[f]easible' means capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors." (§ 21061.1.) Our Supreme Court has described the mitigation section as the "core" of an EIR. (*Goleta Valley, supra,* 52 Cal.3d at p. 564; *Los Angeles Unified School Dist. v. City of Los Angeles* (1997) 58 Cal.App.4th 1019, 1028–1029 (*LAUSD*).)

"Under CEQA, the public agency bears the burden of affirmatively demonstrating that, notwithstanding a project's impact on the environment, the agency's approval of the proposed project followed meaningful consideration of alternatives and mitigation measures." (*Mountain Lion Foundation v. Fish &*

71

*Game Com*. (1997) 16 Cal.4th 105, 134.) "The agency may not approve a project with significant environmental impacts 'if there are . . . feasible mitigation measures available which would substantially lessen' the project's significant environmental impacts." (*Cherry Valley Pass Acres & Neighbors v. City of Beaumont* (2010) 190 Cal.App.4th 316, 348, italics omitted, quoting § 21002.) However, " 'in the event specific economic, social, or other conditions make infeasible . . . such mitigation measures,' the project may be approved despite its significant environmental impacts," upon a finding that overriding project benefits outweigh the significant environmental effects. (*Cherry Valley*, at p. 348, quoting § 21002; *Federation of Hillside & Canyon Assns. v. City of Los Angeles* (2004) 126 Cal.App.4th 1180, 1198 (*Hillside*).) This finding is known as a statement of overriding considerations. (*Hillside*, at p. 1198, citing Guidelines, § 15093; § 21091, subd. (b).) "A statement of overriding considerations . . . offers a proper basis for approving a project despite the existence of unmitigated environmental effects[ ] only when the measures necessary to mitigate or avoid those effects have properly been found to be infeasible." (*City of Marina v. Board of Trustees of California State University* (2006) 39 Cal.4th 341, 368, citing § 21081, subd. (b).)

"Thus, a public agency is not required to favor environmental protection over other considerations, but it must disclose and carefully consider the environmental consequences of its actions, mitigate adverse environmental effects if feasible, explain the reasons for its actions, and afford the public and other affected agencies an opportunity to participate meaningfully in the environmental review process. The purpose

of these requirements is to ensure that public officials and the public are aware of the environmental consequences of decisions before they are made." (*Hillside, supra,* 126 Cal.App.4th at p. 1198, citing *Goleta Valley, supra,* 52 Cal.3d at p. 564.)

Having determined the Project's construction noise impacts would be significant, Metro was required to identify and describe in the EIR all feasible mitigation measures to minimize these adverse impacts. (Guidelines, § 15126.4, subd. (a).) To meet this obligation, the agency proposed noise mitigation measure NOI-A. In summary, the EIR explains the measure would require the project proponent, prior to the issuance of grading permits, to design a construction noise management plan to "reduce construction noise impacts through the use of noise barriers, maintenance of equipment, avoidance of unnecessary equipment idling, the use of electrical equipment where practicable, and locating equipment as far from noise-sensitive receptors to the extent feasible." Notwithstanding implementation of mitigation measure NOI-A, the report discloses noise impacts at a number of receptors "would remain significant and unavoidable during all construction phases."

There is no dispute that Metro intended noise barriers to be the primary means for reducing construction noise impacts under mitigation measure NOI-A. While the EIR details how the elements of the construction noise management plan are to be implemented, none of these measures—other than the noise barriers—has a specific noise reduction target. As for the noise barriers, the EIR explains they are effective only "to the extent that construction activities are shielded (i.e., below the height of sound barriers)." Recognizing this limitation, mitigation measure NOI-A specifies that noise barriers "should have the ability to

73

provide a range of noise reduction between 5 dBA and 15 dBA when the construction equipment is located below the elevation level of the noise barrier and there is no line-of-sight between the construction equipment and the noise-sensitive receptors." However, because construction will occur "at elevations above the tops of sound barriers or in some cases within line-of-sight of noise-sensitive receptors," the EIR discloses noise barriers will have no attenuating benefits for upper-level apartments or other receptors—such as open areas of LASHP and El Pueblo—where construction activities will remain unshielded.[26]

Petitioners assert the EIR's analysis of potentially feasible mitigation measures for the Project's significant construction noise impacts is inadequate. First, they contend mitigation measure NOI-A impermissibly defers details of the proposed construction noise management plan to the extent it lacks performance standards for every element other than noise barriers. Second, petitioners argue Metro abused its discretion by rejecting a proposal to retrofit affected buildings with sound insulation without substantial evidence to support this decision. We agree the EIR's discussion of mitigation measure NOI-A was inadequate and there was insufficient evidence to support Metro's infeasibility finding.

"Where several measures are available to mitigate an impact, each should be discussed [in the EIR] and the basis for selecting a particular measure should be identified."

---

[26]     Due to this limitation, the EIR modeled construction noise impacts for multistory residential receptors at two different elevations—ground level and "at the lowest floor at which a sound barrier would be ineffective because it would not block the line-of-sight between the source and receptor."

74

(Guidelines, § 15126.4, subd. (a)(1)(B).)  The Guidelines direct that "[f]ormulation of mitigation measures shall not be deferred until some future time."  (*Ibid.*)  However, the "specific details" of a mitigation measure "may be developed after project approval when it is impractical or infeasible to include those details during the project's environmental review provided that the agency (1) commits itself to the mitigation, (2) adopts specific performance standards the mitigation will achieve, and (3) identifies the type(s) of potential action(s) that can feasibly achieve that performance standard and that will [be] considered, analyzed, and potentially incorporated in the mitigation measure."  (*Ibid.*)

Petitioners contend mitigation measure NOI-A violates the above directive because, apart from requiring noise barriers that can reduce construction noise in the range of five dBA to 15 dBA when construction activities are shielded, no other element of the proposed construction noise management plan has "specific performance standards the mitigation will achieve." (Guidelines, § 15126.4, subd. (a)(1)(B)).  Petitioners insist this is not a case where it was "impractical or infeasible" to include these details in the EIR.  (*Ibid.*)  Rather, because Metro knows the "precise site of construction," the "location of sensitive receptors," and the "exact equipment" that will be used to construct the Project, petitioners argue the agency's failure to include specific performance standards in the report constitutes an improper deferment of mitigation measures and an abuse of discretion.

In our view, the issue here is not whether Metro has improperly deferred the formulation of mitigation measures. Metro plainly has formulated mitigation measure NOI-A to

75

address the Project's significant construction noise impacts. What the agency has not done, however, is specify the noise reduction that the mitigation measure will achieve, other than the five dBA to 15 dBA reduction that noise barriers should deliver when construction activities are shielded. Thus, the question we must address is not whether mitigation has been improperly deferred, but rather whether the EIR's omission of performance standards for most elements of mitigation measure NOI-A renders the report inadequate as an informational document. We conclude it does.

Respondents maintain performance standards are "only required" where the lead agency finds that a proposed mitigation measure will render an impact "less-than-significant." (Italics and boldface omitted.) But where, as here, an EIR discloses that an environmental impact will remain significant and unavoidable, even with the adoption of "all feasible mitigation," respondents insist the lead agency has no obligation to examine or report on the effectiveness of the mitigation measures it proposes. In support of this position, respondents rely on *King & Gardiner Farms, LLC v. County of Kern* (2020) 45 Cal.App.5th 814 (*King*), where the reviewing court held CEQA allows a lead agency "to adopt measures of uncertain effectiveness and label them mitigation measures" as long as substantial evidence supports the agency's findings that "(1) the measures are at least partially effective, (2) all feasible mitigation measures have been adopted, and (3) the environmental impacts will not be mitigated to less than significant levels." (*Id.* at p. 865.)

Respondents' reliance on *King* overlooks a critical point the reviewing court emphasized in that case. While the *King* court held a lead agency could label measures of uncertain

76

effectiveness "mitigation measures" when the above requirements were met, the court was also careful to recognize that "*[o]ther requirements* related to the adoption of mitigation measures of uncertain effectiveness address *the contents of the EIR* and whether its *disclosures and analysis* of the mitigation measures are adequate." (*King, supra,* 45 Cal.App.5th at p. 866, italics added.)  As the *King* court explained, the EIR's "discussion must justify the adoption of mitigation measures of uncertain effect and support the adoption of the [subsequent] statement of overriding considerations.  To do so, the EIR must (1) describe the mitigation measures that are available (i.e., currently feasible) and (2) identify and *explain* the *uncertainty* in the effectiveness of those measures." (*Ibid*., first italics added.) This requirement follows from "the general principles governing the discussion of mitigation measures," which mandate that the EIR "contain facts and analysis, rather than the agency's bare conclusions or opinions" in order to fulfill the report's "informational role." (*Id.* at pp. 866–867.)  "Uncertainty in the extent a measure will be effective, as well as *the reasons for that uncertainty*, are important facts that should be disclosed to the public and decision makers." (*Id.* at p. 867, italics added.)

The problem with mitigation measure NOI-A is not necessarily that it lacks performance standards for most of its elements.  Rather, as the *King* court recognized, the problem is that the EIR fails to explain *why* Metro could not be certain about each measure's effectiveness.  For example, mitigation measure NOI-A specifies that construction equipment "shall be properly maintained per manufacturers' specifications to prevent noise due to worn or improperly maintained parts," but the EIR does not specify what range of noise reduction this measure should

77

achieve in comparison to the significant construction noise impacts that Metro modeled in the report.  Why?  The EIR does not say.  However, one plausible explanation seemed to be that in modeling the Project's construction noise impacts, Metro's analysis assumed the use of properly maintained equipment and, thus, already accounted for the mitigating effect of this measure.  Indeed, after we raised this possibility with respondents in advance of oral argument, ARTT's counsel confirmed this was the case and conceded the measure would not mitigate the significant construction noise impacts reported in the EIR.  While counsel's candor is welcome, the proper place for this disclosure was not at oral argument, but in the EIR itself.  (See *Vineyard, supra*, 40 Cal.4th at p. 443 ["The audience to whom an EIR must communicate is not the reviewing court but the public and the government officials deciding on the project."].)  Without this disclosure, neither the public nor the decisionmakers who approved the Project could have known this measure would not even partially mitigate the Project's modeled construction noise impacts.  (Cf. *King, supra,* 45 Cal.App.5th at p. 865 [agency may adopt measure of uncertain effectiveness and label it a mitigation measure, as long as substantial evidence supports a finding that measure will be "at least partially effective"]; accord *Sierra Club, supra,* 6 Cal.5th at p. 523 ["Mitigation measures need not include precise quantitative performance standards, but *they must be at least partially effective*, even if they cannot mitigate significant impacts to less than significant levels."  (Italics added.)].)

The same is true of mitigation measure NOI-A's requirement that, "[w]hen possible, on-site electrical sources shall be used to power equipment rather than diesel generators."

No noise reduction target is stated for this measure, and no explanation is provided in the EIR for this omission. Of course, it is conceivable that Metro does not know when it will be "possible" to use on-site electrical sources, so the agency cannot be certain what mitigating effect this condition will have on construction noise impacts. But this is not explained in the EIR. And, in any event, Metro should be able to report the level of noise generally contributed by using diesel generators and how this can be reduced by using electrical sources so the public and decisionmakers can be assured this measure will be at least partially effective in mitigating the Project's modeled construction noise impacts.

As for the requirement that equipment "shall not idle for longer than 5 minutes," at oral argument, ARTT's counsel again confirmed this would have no mitigating effect on the Project's modeled construction noise impacts because Metro's analysis assumed adherence to this measure, which simply calls for the project proponent to comply with existing law. (See Cal. Code Regs., tit. 13, § 2485, subd. (c)(1)(B)(1) [no diesel-fueled commercial vehicle "shall idle for more than 5 consecutive minutes at any location"].) While a condition requiring compliance with regulations can be a reasonable mitigation measure where the regulations impose specific performance criteria, the condition is properly labeled a mitigation measure only if it will be at least partially effective in mitigating a project's significant environmental impacts. (Cf. *Oakland Heritage Alliance v. City of Oakland* (2011) 195 Cal.App.4th 884, 907–912 [where seismic regulations established standards for mitigating earthquake hazards that EIR found would " 'reduce the risk of seismic hazards and ensure that impacts associated

with [the project] would remain less than significant,' " conditions requiring adherence to regulations were properly labeled mitigation measures]; see also *Sierra Club, supra,* 6 Cal.5th at p. 523; *King, supra,* 45 Cal.App.5th at p. 865.) Here, petitioners concede compliance with this measure is necessary to ensure that construction noise levels are not *worse* than those modeled in the EIR, but the measure will otherwise have no mitigating effect.[27] To the extent adhering to this and other elements of mitigation measure NOI-A is necessary simply to ensure that construction noise impacts *remain* at the significant levels reported in the EIR, this fact had to be disclosed in the report so the approving body would not misunderstand

_____

[27] We recognize mitigation measure NOI-A's final element —requiring fixed and stationary equipment (e.g., generators, compressors, concrete mixers) to be "located away from noise-sensitive receptors"—likely will be at least partially effective insofar as Metro's construction noise analysis assumed the "shortest" distance from source to receptor in modeling the Project's impacts. That said, we note this condition's potential effectiveness is apparent only upon close examination of a notation attached to the distance variable in the formula Metro used for calculating construction noise impacts (set forth in Appendix M to the draft EIR), but there is no similar disclosure in the report's relevant discussion of mitigation measure NOI-A. While this alone does not render the EIR deficient, one reading the report should not be expected to "ferret out" this information. (*Vineyard, supra,* 40 Cal.4th at p. 442.) "The data in an EIR must not only be sufficient in quantity, it must be presented in a manner calculated to adequately inform the public and decision makers, who may not be previously familiar with the details of the project. '[I]nformation "scattered here and there in EIR appendices" or a report "buried in an appendix," is not a substitute for "a good faith reasoned analysis." ' " (*Ibid.*)

the measure's effectiveness in making a finding of overriding considerations. (See *King*, at pp. 865–867.) Metro's failure to disclose this information renders the EIR inadequate as an informational document. (See, e.g., *id.*, at pp. 829, 867–869 [where "EIR's disclosures about the mitigation measures were inadequate," subsequent "adoption of a statement of overriding considerations did not render harmless" lead agency's failure to comply with CEQA's information disclosure requirements].)

While the foregoing deficiencies are substantial, our deeper concern lies with Metro's rejection of an additional measure that was suggested to supplement mitigation measure NOI-A. As we have discussed, the identification and analysis of mitigation measures is critical to informing decisionmakers and the public of potential ways in which a project's significant environmental impacts may be substantially reduced. (§ 21002; Guidelines § 15002, subd. (a)(3); *California Native Plant Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 978 (*Native Plant*).) Although CEQA does not require analysis of " ' " 'every *imaginable* alternative or mitigation measure,' " ' " the "EIR must respond to specific suggestions for mitigating a significant environmental impact unless the suggested mitigation is facially infeasible." (*LAUSD, supra,* 58 Cal.App.4th at p. 1029; *Concerned Citizens of South Central L.A. v. Los Angeles Unified School Dist.* (1994) 24 Cal.App.4th 826, 841.) Feasibility at this stage means the suggested measure is "capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors." (§ 21061.1; *Mira Mar, supra,* 119 Cal.App.4th at p. 489.) The agency's response "need not be exhaustive," but "it should evince good faith and a reasoned

analysis." (*LAUSD,* at p. 1029.)  As our Supreme Court has repeatedly observed, "it is only the EIR that can effectively disclose to the public the 'analytic route the . . . agency traveled from evidence to action.' " (*Goleta Valley, supra,* 52 Cal.3d at p. 568, quoting *Topanga, supra,* 11 Cal.3d at p. 515; accord *Laurel Heights, supra,* 47 Cal.3d at p. 404.)  Thus, " 'the EIR must contain facts and analysis, not just the agency's bare conclusions or opinions.' " (*Goleta Valley,* at p. 568, quoting *Concerned Citizens of Costa Mesa, Inc. v. 32nd Dist. Agricultural Assn.* (1986) 42 Cal.3d 929, 935.)  "Conclusory statements unsupported by factual information will not suffice."  (Guidelines, § 15088, subd. (c); accord § 21168.5 ["Abuse of discretion is established . . . if the [agency's] determination or decision is not supported by substantial evidence."]; see *Covington, supra,* 43 Cal.App.5th at pp. 878–879.)

After publication of the draft EIR, Metro received comments from TCE regarding the report's proposed mitigation measures.  Among other things, TCE suggested that, in addition to sound barriers, Metro should consider and adopt a measure to install "noise insulation" in "adjacent buildings" that would be most affected by the Project's significant construction noise impacts.[28]  Specifically, TCE commented that "[i]nsulating

---

[28] In addition to retrofitting buildings, TCE suggested that Metro consider "traffic management measures, creating buffer zones, [and] planting vegetation" to mitigate the Project's construction noise impacts.  Petitioners do not challenge Metro's rejection of these suggestions.  They do, however, identify new mitigation measures that they contend Metro had an "affirmative duty" to consider before certifying the EIR.  Respondents insist the exhaustion doctrine bars petitioners from raising these new arguments for the first time in litigation to challenge the EIR's

buildings can greatly reduce construction noise, especially when windows are sealed and cracks and other openings are filled."

Metro rejected the proposal as infeasible in the final EIR. The agency explained that "typical building constructions/ systems (in warm climate[s]) provide a noise reduction of 12 dBA with windows open and up to 24 dBA for building constructions/ systems with windows closed."[29]  Thus, Metro noted, "existing buildings provide exterior-to-interior noise attenuation that is not accounted for in the analysis of noise impacts in the Draft EIR."

certification.  We agree.  Most duties imposed on the lead agency under CEQA can rightly be characterized as affirmative duties, yet the Legislature has seen fit to mandate that an action may not be brought to challenge an EIR "unless the alleged grounds for noncompliance . . . were presented to the public agency . . . during the public comment period."  (§§ 21177, subd. (a), 21167, subd. (c).)  This is a "jurisdictional prerequisite to maintenance of a CEQA action" (*Bakersfield, supra,* 124 Cal.App.4th at p. 1199), and petitioners have cited nothing to suggest reviewing courts have greater authority to consider new charges of noncompliance when mitigation measures are at issue.  (See, e.g., *Tiburon, supra,* 78 Cal.App.5th at pp. 758–759 [petitioner did "not point to any alternative measure *mentioned during the extensive administrative proceedings* that would have improved matters but was rejected" by lead agency (italics added)]; cf. *Goleta Valley, supra,* 52 Cal.3d at pp. 561–563, 567–568 [administrative exhaustion not at issue because petitioner raised objections regarding project alternatives in appeal to county board of supervisors, and board had opportunity to respond to objections before supplemental EIR was challenged in court].)

[29]     In support of these figures, Metro cited the same EPA guidelines concerning potential health impacts from excessive environmental noise that we discussed above.

83

Moreover, the agency asserted, "upgrades to building insulation or windows are generally only considered as potential noise mitigation where a project results in significant operational noise impacts because the installation of building upgrades would result in additional construction." The agency added that this "additional construction could result in even greater impacts to sensitive receptors due to the use of equipment and construction activity within currently occupied dwelling units." Thus, Metro concluded, "the secondary impacts resulting from installation of building insulation upgrades would outweigh any benefit to reducing construction noise impacts" and, therefore, retrofitting impacted buildings would not be a "feasible mitigation strategy."

Petitioners contend there is insufficient evidence to support Metro's rejection of the proposed mitigation measure. They argue Metro offered no evidence to support its assertion that sound insulation is "generally only considered" for operational noise and, even if there were evidence, "standard custom and practice" is an insufficient reason to reject an otherwise feasible mitigation measure. Petitioners also insist Metro offered no evidence to support its assertion that installing upgraded sound insulation would "result in even greater impacts" than would be mitigated, as the EIR provides no analysis of what construction noise impacts individuals will experience inside buildings. They add that Metro's rejection of the suggested mitigation measure is unsupported because the agency offered "[n]o financial data or estimates of the construction costs, noise levels, and duration" for the modest retrofits that were suggested.

We agree Metro's decision to reject acoustic retrofitting as a potential mitigation measure was conclusory and lacked substantial evidentiary support. As to the agency's first point,

while there is no doubt that "existing buildings provide exterior-to-interior noise attenuation," the fact that this was "not accounted for in the analysis of noise impacts in the Draft EIR" is not a justification for rejecting a measure that may enhance these noise attenuating benefits.  On the contrary, this seems to us an admission that the report did not fully consider the magnitude of the impact or how it might have informed Metro's consideration of mitigation measures.  "[A]n EIR's designation of a particular adverse environmental effect as 'significant' does not excuse the EIR's failure to reasonably describe the nature and magnitude of the adverse effect.  [Citations.]  An adequate description of adverse environmental effects is necessary to inform the *critical discussion of mitigation measures* and project alternatives at the core of the EIR."  (*Cleveland National Forest Foundation v. San Diego Assn. of Governments* (2017) 3 Cal.5th 497, 514–515, italics added; accord *Sierra Club, supra,* 6 Cal.5th at p. 514.)  We see no problem with Metro assessing project impacts under a "worst case scenario" in making a significance determination; however, the agency's decision to adopt this approach does not relieve it of the obligation to evaluate the full magnitude of an impact in assessing potential mitigation measures.  Without studying interior noise levels, Metro could not reasonably determine that acoustic retrofitting would be infeasible based on the mere assumption that existing building exteriors already afford sufficient noise attenuation.  This is the sort of conclusory justification that CEQA forbids.  (See *Covington, supra,* 43 Cal.App.5th at p. 879; see also, e.g., *LAUSD, supra,* 58 Cal.App.4th at pp. 1029–1030 [response that carbon monoxide levels around schools would be " 'slightly lower' in the future" did not justify rejection of suggested mitigation measure

where EIR disclosed project was " 'likely' " to have " 'residual *significant* adverse impact on air quality' "].)

Metro's assertion that acoustic retrofitting is "generally only considered as potential noise mitigation" for "significant *operational* noise impacts" similarly lacks substantial evidentiary support. (Italics added.) Although not cited in the EIR, respondents now point to materials in the administrative record that they say confirm "there are no instances where building insulation has been used to address temporary construction noise."[30] (Italics and boldface omitted.) However, one of these records—a Caltrans Guide for Measuring, Modeling, and Abating Highway Operation and Construction Noise Impacts—recognizes that it may in fact be feasible to abate "*construction* noise" at a "receiver" or "residence" through the use of "window treatment or other insulation techniques" when other measures, like "noise barriers," are not sufficiently effective. (Italics added.) The Caltrans manual notes that "most methods and procedures" it recommends "are in conformance with industry standards and practices." Other materials in the administrative record

---

[30] Respondents' reliance on the administrative record is not improper. "[T]he administrative record may be studied 'to assess the degree of discussion any particular alternative deserves, based on the alternative's feasibility and the stage in the decisionmaking process it is brought to the attention of the agency.' " (*Goleta Valley, supra,* 52 Cal.3d at p. 569.) Where potential alternatives or mitigation measures are not discussed in detail in the EIR because the agency deemed them infeasible, " 'the evidence of infeasibility need not be found within the [EIR] itself. Rather a court may look at the administrative record as a whole to see whether an alternative deserved greater attention in the [EIR].' " (*Ibid.*)

86

attest to the efficacy of acoustic retrofitting as a noise mitigation measure for operational impacts without ruling it out as an option for temporary construction noise.[31]  Nevertheless, respondents insist that, "[g]iven the lack of any evidence [for] retrofitting buildings to mitigate temporary construction impacts, Metro was not required to adopt such mitigation *or evaluate it further*."  (Italics added.)  This is incorrect.  As the *Covington* court observed, a reviewing "court is tasked with determining whether substantial evidence supports the [lead agency's] findings"—not whether "the mitigation measures proposed by the *petitioners* were . . . supported by substantial evidence." (*Covington, supra,* 43 Cal.App.5th at p. 880.)  Nothing in the materials respondents have cited supports Metro's finding that acoustic retrofitting is inherently infeasible for the mitigation of significant (albeit temporary) construction noise impacts. (See, e.g., *id.* at pp. 880–881 [finding lead agency failed to give "good faith, reasoned analysis" for rejecting suggested mitigation measure where agency invoked industry standards but did not demonstrate stricter leak detection and repair program for

---

[31]    For example, respondents direct our attention to the FTA's Transit Noise and Vibration Impact Assessment Manual, which, like the Caltrans manual, observes that in "cases where noise barriers are not feasible—such as multi-story buildings, . . . the only practical noise mitigation measure may be to provide sound insulation for the buildings."  While the FTA manual discusses this mitigation measure only in its section on operational impacts, the manual does not suggest (as respondents claim) that the secondary impacts from installation of sound insulation make the measure infeasible for mitigating significant construction noise impacts.  The manual simply does not address the issue.

petroleum plants would not be feasible for proposed geothermal plant project].)

Finally, respondents insist it is "common sense" that "[i]ndeterminate construction inside an apartment will obviously be louder and more disruptive than construction down the street," but they cite no *evidence* to support Metro's assertion that acoustic retrofitting "could result in even greater impacts to sensitive receptors" that "would outweigh any benefit to reducing construction noise impacts." The argument is unconvincing. To begin, characterizing the retrofitting work as "indeterminate" seems to admit that Metro did not meaningfully investigate the measure's feasibility. TCE's comment letter suggested specific retrofits, observing that "[i]nsulating buildings can greatly reduce construction noise, especially when windows are sealed and cracks and other openings are filled." Metro's analysis found that for residents of adjacent apartments construction noise levels could reach from 71.2 dBA to 91.8 dBA at the buildings' exteriors. Even assuming residents would benefit from the "typical" noise reduction cited in the EIR for building interiors with windows closed (a figure that has not been confirmed by any of Metro's testing for any of the impacted noise-sensitive receptors), construction noise levels would still be roughly equivalent to the sound of a dishwasher running in the next room and could reach levels close to the noise heard from a vacuum cleaner running 10 feet away. Common sense does not suggest to us that a brief period of construction work to replace windowpanes or seal cracks in a building's façade would be "louder and more

disruptive" than living with these noise levels up to 10 hours a day for 25 months.[32]

To be clear, we are not holding that Metro must find acoustic retrofitting is a feasible mitigation measure. But we must also emphasize that the " 'preparation and circulation of an EIR is more than a set of technical hurdles for agencies and developers to overcome. The EIR's function is to ensure that government officials who decide to build or approve a project do so with a full understanding of the environmental consequences and, equally important, that the public is assured those consequences have been taken into account.' " (*Banning Ranch Conservancy v. City of Newport Beach* (2017) 2 Cal.5th 918, 941.) Consistent with these foundational principles, we are charged with assessing whether the EIR met CEQA's information disclosure requirements. In this case, it did not because the report's feasibility conclusion was not supported by substantial evidence. (Guidelines, § 15088, subd. (c); see *Covington, supra,* 43 Cal.App.5th at p. 880.) Where the lead agency has not complied with CEQA's informational requirements, it has "failed to proceed in 'a manner required by law' and has therefore abused its discretion." (*Save Our Peninsula, supra,* 87 Cal.App.4th at p. 118.)

---

[32] To the extent petitioners challenge Metro's rejection of a suggestion to limit construction activities to "daytime hours on weekdays," we agree with respondents that Metro reasonably relied upon the City of Los Angeles's governing regulations in setting the proposed construction schedule.

## 8. *Metro Reasonably Exercised Its Discretion in Finding Project Alternatives Were Infeasible*

"CEQA requires that an EIR, in addition to analyzing the environmental effects of a proposed project, also consider and analyze project alternatives that would reduce adverse environmental impacts." (*In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1163 (*Bay-Delta*), citing §§ 21061, 21001, subd. (g), 21002, 21002.1, subd. (a), 21003, subd. (c); *Goleta Valley, supra,* 52 Cal.3d at pp. 564–565.) The Guidelines direct that an EIR must "describe a range of reasonable alternatives to the project . . . which would feasibly attain most of the basic objectives of the project but would avoid or substantially lessen any of the significant effects of the project." (Guidelines, § 15126.6, subd. (a).) "An EIR need not consider every conceivable alternative to a project or alternatives that are infeasible." (*Bay-Delta*, at p. 1163, citing Guidelines § 15126.6, subd. (a); *Goleta Valley,* at p. 574.)

Petitioners raise two challenges to Metro's alternatives analysis. First, they contend the agency formulated "artificially narrow project purposes and objectives," effectively rendering it a " 'foregone conclusion' " that Metro would reject an alternative to expand the existing Dodger Stadium Express bus service (the Bus Alternative) in favor of the Project's aerial gondola system.[33] Second, petitioners argue the agency's statement of overriding considerations is defective as it relies on the "misleading premise" that the Bus Alternative must funnel all passengers through LAUS, rather than adding regional pickup points to

---

[33] The EIR refers to this alternative as the Transportation Systems Management or TSM Alternative.

transport attendees to Dodger Stadium.  We conclude neither contention has merit.

"The process of selecting the alternatives to be included in the EIR begins with the establishment of project objectives by the lead agency." (*Bay-Delta, supra,* 43 Cal.4th at p. 1163.) "CEQA does not restrict an agency's discretion to identify and pursue a particular project designed to meet a particular set of objectives.  CEQA simply requires the agency to thereafter prepare and certify a legally adequate EIR that provides the agency and the public alike with detailed information regarding the proposed project's significant environmental impacts, as well as reasonable alternatives that 'would feasibly attain most of the basic objectives of the project but would avoid or substantially lessen [those impacts].'" (*California Oak Foundation v. Regents of University of California* (2010) 188 Cal.App.4th 227, 276–277, quoting Guidelines, § 15126.6, subd. (a).)  "Although a lead agency may not give a project's purpose an artificially narrow definition, a lead agency may structure its EIR alternative analysis around a reasonable definition of underlying purpose." (*Bay-Delta,* at p. 1166.)

As with measures to mitigate a project's significant environmental impacts, the nature and scope of project alternatives that the lead agency must examine is "guided by the doctrine of 'feasibility.'" (*Goleta Valley, supra,* 52 Cal.3d at p. 565.)  The feasibility of alternatives "arises at two different junctures:  (1) in the assessment of alternatives in the EIR and (2) during the agency's later consideration of whether to approve the project." (*Native Plant, supra,* 177 Cal.App.4th at p. 981.)  At the EIR stage, the question is whether the alternative is *potentially* feasible—that is, whether it is "capable of being

91

accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors." (§ 21061.1; *Native Plant,* at p. 981.) At the project approval stage, the decisionmaking body evaluates whether the alternatives are *actually* feasible—that is, whether "[s]pecific economic, legal, social, technological, or *other considerations* . . . make infeasible the . . . alternatives identified in the environmental impact report." (§ 21081, subd. (a)(3), italics added; *Native Plant,* at p. 981; *Rialto Citizens for Responsible Growth v. City of Rialto* (2012) 208 Cal.App.4th 899, 948 (*Rialto*).)

Broader considerations come into play when the decisionmaking body considers actual feasibility, as compared to when the EIR preparer assesses potential feasibility of project alternatives. (*Native Plant, supra,* 177 Cal.App.4th at p. 1000.) For example, while policy matters are not appropriate for consideration during the first stage feasibility analysis, they may play a role in the decisionmakers' determination of whether to adopt or reject an alternative set forth in the EIR. (See, e.g., *Rialto, supra,* 208 Cal.App.4th at pp. 947–948.) Thus, at the latter stage, "the decision makers may reject as infeasible alternatives that were identified in the EIR as potentially feasible." (*Native Plant,* at p. 981.)

The EIR states the Project's "overall purpose" is "to provide a direct transit connection between LAUS and the Dodger Stadium property via an aerial gondola system, and improve connectivity for the surrounding communities by linking to the [LASHP], Elysian Park, and the region's rapidly growing regional transit system at LAUS." The report lists the following

13 objectives that, according to Metro, were formulated to align with this overall purpose:

- Expand mobility options for transit riders through a direct connection between LAUS and Dodger Stadium, a regional event center.
- Attract new transit riders to the Metro system through a unique experience connecting to Dodger Stadium.
- Improve the Dodger Stadium visitor experience by providing efficient, high-capacity, and faster alternative access to Dodger Stadium.
- Enhance safety of neighborhoods adjacent to Dodger Stadium by reducing the number of vehicles in the area.
- Reduce transportation-related pollution and greenhouse gas emissions as a result of reduced vehicular congestion in and around Dodger Stadium, on neighborhood streets, arterial roadways, and freeways during game and special event days.
- Increase connectivity of people to the region's public transportation hub at LAUS and the Dodger Stadium property.
- Improve transit rider experience by providing unique scenic views of the Los Angeles area to aerial transit system passengers and Dodger fans.
- Bring a world class aerial transit system to the Los Angeles area.
- Enhance community connectivity by providing first/last mile transit and pedestrian access to areas

that have historically been underserved, including the LASHP and Elysian Park.

– Identify comparable, affordable, and accessible fare opportunities for community and LASHP and Elysian Park access.

– Minimize the Project's environmental footprint through the integration of sustainability and environmentally-friendly design features into the materials, construction, operations, and maintenance of the proposed Project.

– Provide a sustainable form of transit by operating the aerial transit system with the use of zero emission electricity with battery storage backup in order to reduce greenhouse gas emissions and improve air quality.

– Maximize the Project's alignment along the public right-of-way and minimize aerial rights requirements over private properties, taking into account existing and future adjacent land uses.

Latching on to the phrase "via an aerial gondola system" in the Project's stated overall purpose, petitioners argue Metro designed the Project's objectives "primarily to pursue the Gondola Project." They say the EIR "lists several artificially narrow project objectives"—including, attracting new transit riders to the Metro system "through a unique experience connecting to Dodger Stadium," bringing a "world class aerial transit system to the Los Angeles area," and providing "a sustainable form of transit by operating the [aerial rapid transit] system with the use of zero emission electricity"—all with the "clearly intended" objective "to 'mirror[ ]' the Project as proposed." In petitioners'

94

telling, although the Bus Alternative would meet "*most* of the Project objectives" and fulfill the Project's purpose of "reducing traffic and congestion around Dodger Stadium," the EIR's "definition of Project objectives all but exclude[d] any alternative that [was] not an aerial tram, thus putting a thumb on the scale that Metro use[d] to reject the Bus Alternative for not meeting the Project's 'overall purpose.'"

Our review of the EIR and statement of overriding considerations confirms Metro reasonably assessed the Bus Alternative and did not use artificially narrow project objectives to ensure the alternatives analysis would be a foregone conclusion. As explained in the EIR, the Bus Alternative contemplated an expansion of the existing Dodger Stadium Express (DSE) bus service to provide increased capacity similar to the Project's anticipated capacity of approximately 5,000 people per hour per direction between LAUS and Dodger Stadium. To meet this target based on the 65-passenger capacity of the 45-foot buses currently operating on the DSE, the report found 77 bus trips per hour, or an average of one bus departing approximately every 47 seconds, would be required.[34] Because this departure frequency would, according to Metro's analysis, require a minimum of six buses loading simultaneously, the report also found the Bus Alternative would necessitate relocation of the DSE's current loading zone at LAUS to a dedicated bus plaza with sufficient size to accommodate the expansion. This relocation, in turn, would require reconfigurations of traffic signals, the DSE's bus-only lane, and other operational changes.

---

[34] At the time of Metro's analysis, the DSE service made up to eight bus trips per hour.

Although the Bus Alternative would not create a "direct transit connection," the EIR found it "would provide enhanced transit access between LAUS and Dodger Stadium," thus partially satisfying the Project's overall purposes and constituting a potentially feasible project alternative. And, because the Bus Alternative would not result in the Project's significant and unavoidable construction noise impacts or any other significant environmental impact, the report found it was an environmentally superior alternative to the Project. Thus, the EIR proposed it as a feasible alternative to the Project.

At the project approval stage, while recognizing the Bus Alternative would provide enhanced transit access to Dodger Stadium, Metro's statement of overriding considerations rejected it as a feasible alternative, finding expanding the DSE service would "not provide the same level of benefits [as] the proposed Project." The statement shows the agency's central considerations were not objectives unique to an aerial gondola system, but rather were the relative impacts the Project and Bus Alternative would have on curbing traffic congestion and vehicle emissions, while improving regional connectivity for surrounding communities. For example, the statement acknowledges the Bus Alternative might result in more people "traveling to Dodger Stadium by public transit compared to existing conditions," but it finds this would not relieve traffic congestion to the same degree as the Project, because expanding the DSE service would require "additional buses creating an increase of activity and resulting in higher emissions." Along the same lines, the statement recounts evidence from the EIR showing operational changes would be required on surrounding streets for the DSE service to match the Project's capacity,

96

which in turn would "increase traffic congestion" and "displace existing curb parking that is currently used by the community." Additionally, while the Project would operate daily to serve residents, workers, and visitors to the region, the statement observes the Bus Alternative would not achieve the same level of improved "connectivity for the surrounding communities," as the DSE service would operate "on Dodger game days only." Ultimately, the statement determined the Project "would provide the quickest, most frequent, and highest capacity transit connection for the most riders travelling to Dodger Stadium" and, therefore, the Bus Alternative was "not desirable or feasible based on the specific economic, social, and land use policy considerations" that Metro evaluated.

Contrary to petitioners' contention, the statement of overriding considerations plainly demonstrates Metro did not reject the Bus Alternative "on the claim that the Project's purpose requires an aerial gondola system." Rather, as the statement shows, Metro principally based its ultimate feasibility determination on objectives that the EIR found the Bus Alternative *partially met*—e.g., enhancing transit access and reducing emissions. It cannot be the case that Metro drew the Project's purpose so narrowly as to make the alternatives analysis a foregone conclusion while, at the same time, the objectives were stated broadly enough that the Bus Alternative "meets *most*" of them, as petitioners maintain. Given the overall scope of the Project objectives, we do not see a handful of references to an aerial gondola system or "unique scenic views" as defining the Project's purpose so narrowly that it precluded informed decision making or public participation regarding environmentally superior alternatives. (See, e.g., *California*

97

*Natural Gas Vehicle Coalition v. State Air Resources Bd.* (2024) 105 Cal.App.5th 304, 324 [although project objectives contained multiple points that "clearly indicate[d] or strongly suggest[ed]" the project was designed to support transition to zero-emission vehicles, "overall scope" of objectives showed purpose was not "unduly narrow" as to preclude meaningful consideration of low-emission alternative].)

*We Advocate Through Environmental Review v. County of Siskiyou* (2022) 78 Cal.App.5th 683 (*WATER*), upon which petitioners rely, is materially different. There, the reviewing court held an EIR's stated objectives "were 'so narrow[ ] as to preclude any alternative other than the Project.'" (*Id.* at p. 692.) The project in that case involved permits for the operation of a spring water bottling facility on a site formerly developed and operated as a bottling plant. (*Id.* at pp. 687–688.) The stated project objectives "mirror[ed] the proposed project itself," including "use of 'the full production capacity of the existing Plant,'" locating the proposed facility "'at the Plant,'" and allowing the "'operation of the Plant as soon as possible.'" (*Id.* at p. 692.) Because "[n]o alternative apart from the rehabilitation of the existing plant" could meet these objectives, the reviewing court held the lead agency's "artificially narrow approach for describing the project objectives" "prejudicially prevented informed decisionmaking and public participation." (*Id.* at pp. 692–693.)

Unlike in *WATER*, the Project's overall purpose and objectives here were not so narrowly drawn that they prevented Metro from studying and reporting on the Bus Alternative (as the agency did in the EIR) or that they precluded decisionmakers from considering and weighing the alternative's benefits and

98

environmental impacts relative to those of the Project (as Metro did in the statement of overriding considerations).  Again, as petitioners acknowledge, the Bus Alternative met many of the Project objectives and at least partially aligned with the Project's overall purpose such that Metro determined it was a potentially feasible and environmentally superior alternative to the Project.  "Broader considerations of policy," however, "come into play when the decisionmaking body is considering actual feasibility than when the EIR preparer is assessing potential feasibility" of an alternative.  (*Native Plant, supra,* 177 Cal.App.4th at p. 1000; see § 21081, subd. (a)(3).)  "[I]t does not subvert the CEQA environmental review process for the ultimate decision maker to reject as infeasible alternatives identified in the EIR," as " 'it is the *public agency* that bears the responsibility for the decisions that must be made before a project can go forward, including determinations of feasibility and whether *the benefits of a project outweigh the significant effects* the project will have on the environment.' " (*Native Plant,* at p. 1000, second italics added.)  That is exactly what happened here.  Metro decisionmakers weighed the relative benefits of the Bus Alternative and the Project and made a *policy judgment* that the Project's greater benefits outweighed the significant environmental impacts that could be avoided by adopting the Bus Alternative.  Because substantial evidence supports that judgment, we have no warrant to second guess the balance that was struck.  (See *id.* at p. 983 ["The override decision 'lies at the core of the lead agency's discretionary responsibility under CEQA and is, for that reason, not lightly to be overturned.' "]; *San Diego Citizenry Group v. County of San Diego* (2013) 219 Cal.App.4th 1, 24 [the statement of overriding considerations demonstrates

99

" 'the balance struck' " by the decisionmaking body in " 'weighing the "benefits of a proposed project against its unavoidable environmental risks" ' " and the statement is "adequate if supported by substantial evidence"].)

Petitioners' remaining argument challenges the statement of overriding considerations, characterizing it as "defective" for relying on the "misleading premise" that the Bus Alternative could not be implemented with "additional pickup points" that distributed the DSE's transit capacity "throughout the *region*." In essence, petitioners appear to argue Metro improperly dismissed a "regional" variation of the Bus Alternative as not even *potentially* feasible and, thus, did not consider its *actual* feasibility in the statement of overriding considerations. (See *Native Plant, supra,* 177 Cal.App.4th at p. 981.) Because substantial evidence supports the agency's feasibility analysis, we find no abuse of discretion. (See *Goleta Valley, supra,* 52 Cal.3d at pp. 566–567.)

" 'There is no ironclad rule governing the nature or scope of the alternatives to be discussed other than the rule of reason.' ([Guidelines], § 15126.6, subd. (a).) The rule of reason 'requires the EIR to set forth only those alternatives necessary to permit a reasoned choice' and to 'examine in detail only the ones that the lead agency determines could feasibly attain most of the basic objectives of the project.' (*Id.*, § 15126.6, subd. (f).) An EIR does not have to consider alternatives 'whose effect cannot be reasonably ascertained and whose implementation is remote and speculative.' (*Id.*, § 15126.6, subd. (f)(3).)" (*Bay-Delta, supra,* 43 Cal.4th at p. 1163.)

In challenging the statement of overriding considerations, petitioners ignore Metro's thorough analysis of a regional

bus alternative in the EIR. As Metro recounted in the report, public comments had suggested the agency analyze a "bus-only alternative" that would transport passengers at "numerous remote locations throughout the Los Angeles region to and from Dodger Stadium events." In studying the suggested alternative, Metro reviewed data collected from an "existing example" of this type of regional service—a current DSE service line running from the South Bay region of the Los Angeles metropolitan area to Dodger Stadium. This data showed that, despite serving a broad area of the southern Los Angeles region at stations spread across an eight-mile route and offering a cost-free service traveling on a priority freeway lane for most of the trip, "the South Bay DSE carried an average of only 415 passengers per game in 2019," which was "substantially lower than the ridership of 1,895 riders per game on the LAUS Dodger Stadium Express." Based on this data and "existing ridership patterns," Metro found "the majority" of DSE riders used "rail transit" to connect with the DSE at LAUS, which explained why the DSE service from LAUS had a higher ridership than the South Bay DSE. The agency also found, based on this data, that expanding the DSE service to accommodate regional pickups "would result in a fleet of buses that would either be underutilized most of the time," or, if regular Metro bus services could use the additional vehicles, would result in disruption to those services during every Dodger Stadium event.

Metro's analysis and the evidence it relied on support the agency's determination that a regional variation of the Bus Alternative was not potentially feasible and, therefore, did not have to be included as a proposed alternative in the EIR. As the agency's analysis shows, this regional variation would

101

entail greater operational challenges than those already posed by the Bus Alternative, yet, in comparison, it would not materially advance the Project's overall purpose of providing a direct transit connection between LAUS and Dodger Stadium while improving connectivity for the surrounding communities. "[A]n EIR need not study in detail an alternative that is infeasible or that the lead agency has reasonably determined cannot achieve the project's underlying fundamental purpose." (*Bay-Delta, supra,* 43 Cal.4th at p. 1165.) When the EIR sets forth a reasonable range of alternatives, it " 'does not become vulnerable because it fails to consider in detail each and every conceivable variation of the alternatives stated.' " (*Laurel Heights, supra,* 47 Cal.3d at pp. 406–407.) Judged against the rule of reason that governs our review, we conclude Metro selected a reasonable range of alternatives—including the Bus Alternative—for analysis in the EIR. No more was required.[35] (See *Native Plant, supra,* 177 Cal.App.4th at p. 995; see also *Goleta Valley, supra,* 52 Cal.3d at pp. 566–567 [no abuse of discretion where substantial evidence supported lead agency's determination that "none of the additional sites represented a feasible project alternative or merited extended discussion in the EIR"].)

---

[35] We need not consider a motion raised in the Los Angeles City Council calling for an "updated Dodger Stadium Traffic Assessment" before the Council takes further action to approve the Project. Because substantial evidence supports Metro's selection of a reasonable range of alternatives, it is irrelevant that another agency might have reasonably reached a different conclusion. (See *Laurel Heights, supra,* 47 Cal.3d at p. 393.)

**9.**  ***Metro Prejudicially Abused Its Discretion by Failing to Engage in Timely Consultation with a Trustee Agency***

CEQA requires the lead agency to consult with all trustee agencies before determining whether an EIR is required for a project.  (§ 21080.3, subd. (a).)  " 'Trustee agency' means a state agency that has jurisdiction by law over natural resources affected by a project, that are held in trust for the people of the State of California."  (§ 21070.)  If the lead agency determines a project requires an EIR, the agency "shall immediately send notice of that determination" to each trustee agency.  (§ 21080.4, subd. (a); Guidelines, § 15082, subd. (a).)  The Guidelines refer to this mandated notice as a "notice of preparation."  (Guidelines, § 15082, subd. (a).)  Before completing the EIR, CEQA further requires the lead agency to "consult with, and obtain comments from, each responsible agency, trustee agency, any public agency that has jurisdiction by law with respect to the project, and any city or county that borders on a city or county within which the project is located."  (§ 21104, subd. (a).)

Petitioners contend Metro violated CEQA's procedural mandates by failing to consult with the Santa Monica Mountains Conservancy (the Conservancy)—a trustee agency with jurisdiction over the natural resources of the Santa Monica Mountains Zone, including LASHP, El Pueblo, Elysian Park, and the connections between them.  (See § 33105.)[36]  They say

_____

[36]    The Legislature created the Conservancy as part of the Santa Monica Mountains Conservancy Act (the Conservancy Act) to address fractured land use in the Santa Monica Mountains Zone that could negatively impact recreational and environmental value.  (See § 33000 et seq.)  The Conservancy Act

the undisputed evidence proves Metro both failed to send the Conservancy the mandatory notice of preparation before preparing the draft EIR and failed to consult with the Conservancy regarding the report as mandated under CEQA.

Respondents concede Metro did not send the notice of preparation to the Conservancy, but they argue this violation was not prejudicial because Metro sent two notices to the trustee agency before the final EIR's certification, and the Conservancy never responded.  Respondents further contend petitioners have not met their burden to establish prejudice because they have offered "no evidence that any failure to notify the Conservancy led Metro to overlook material information."

Petitioners insist the lack of response from the Conservancy is itself prejudice resulting from Metro's failure

---

declares that the zone "exists as a single ecosystem in which changes that affect one part may also affect all other parts[,] and that the preservation and protection of this resource is in the public interest." (§ 33001.)  The Legislature had found that "planning for the zone was fragmented and there were ineffective means of . . . evaluating individual projects within the zone as to their effect on the entire region." (§ 33002.)  As a result, "piecemeal development projects were occurring within the zone which resulted in the irreplaceable loss of open space and recreational resources." (*Ibid*.)  To address this environmental harm, the Conservancy Act created the Conservancy as a "single governmental agency with responsibility for implementing a mandate to protect and preserve the Santa Monica Mountains Zone and to promote recreational, open space, park, and conservation purposes through the acquisition, development, and management of properties." (*Robings v. Santa Monica Mountains Conservancy* (2010) 188 Cal.App.4th 952, 957, citing § 33200, subd. (a).)

to follow CEQA's procedural mandates, as it led to the omission of critical information regarding significant environmental issues and reasonable mitigation measures that the Conservancy otherwise could have asked Metro to explore in the draft EIR. Accordingly, petitioners argue controlling Supreme Court precedent places the burden on Metro to overcome this showing of prejudice by demonstrating the omitted information was immaterial. (See *Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection* (2008) 44 Cal.4th 459, 487–488 (*EPIC*); see also *Rural Landowners Assn. v. City Council* (1983) 143 Cal.App.3d 1013, 1022–1023 (*Rural Landowners*); *Fall River Wild Trout Foundation v. County of Shasta* (1999) 70 Cal.App.4th 482, 491–493 (*Fall River*).) They contend Metro's late notices—the earliest sent five months after the public comment period had closed—were insufficient to satisfy this burden. We agree.

*EPIC* controls our prejudice analysis. The petitioners there challenged the sufficiency of an EIR, arguing the lead agency failed to consider certain public comments submitted during the environmental review process. (*EPIC, supra,* 44 Cal.4th at pp. 477, 483.) The agency admitted the violation, and our high court framed the dispositive issue as "whether the error in failing to consider the . . . comments is prejudicial." (*Id*. at pp. 483–484.) In answering this question, the *EPIC* court emphasized that review of public comments is " 'essential to CEQA' " as it " ' "ensures that appropriate alternatives and mitigation measures are considered, and permits input from agencies with expertise" ' " relevant to a project's significant environmental impacts. (*Id*. at p. 486.) Notwithstanding this critical function, the court held "an agency's failure to consider public comments

105

is not necessarily prejudicial," as there are conceivable circumstances where the violation could be shown to be "insubstantial or de minimis." (*Id.* at pp. 486–487.) However, because the error resulted in an omission of information, these nonprejudicial circumstances were limited and *the burden rested with the agency that committed the violation* to make the necessary showing. (*Id.* at p. 487.) Our Supreme Court explained:

> "For example, when the material not considered was, on its face, demonstrably repetitive of material already considered, or so patently irrelevant that no reasonable person could suppose the failure to consider the material was prejudicial, or when the omitted material supports the agency action that was taken, then such omissions do not subvert the purpose of the public comment provisions and are nothing more than technical error. Short of these showings, *which the agency that failed to consider the comments would have the burden to make, the omission of the information must be deemed prejudicial.*" (*Ibid.*, italics added.)

The reasoning in *Rural Landowners* strongly informed our high court's prejudice analysis in *EPIC*. (See *EPIC, supra,* 44 Cal.4th at pp. 486–487.) The petitioners in *Rural Landowners* challenged a city council's approval of a development project, arguing the draft EIR was not submitted to the State

Clearinghouse within the time prescribed under CEQA.[37] (*Rural Landowners, supra,* 143 Cal.App.3d at pp. 1018–1019.) Due to this error, the city was unable to consider and respond to comments from relevant state agencies before approving the final EIR. (*Rural Landowners,* at pp. 1017–1018.) Although the city admitted the violation, the trial court found the omission was harmless, as the comments had been incorporated into an addendum after the EIR's approval, and the city council had not changed its decision to approve the project. (*Id.* at pp. 1018–1019.) The *Rural Landowners* court rejected this harmless error analysis, explaining:

> "In passing on questions under CEQA the trial court's duty is to consider the *legal sufficiency* of the steps taken by the local agency, and *not* to consider the validity of the conclusions reached. . . . [¶] By focusing its consideration of prejudice on the *result*, the trial court ignored the *prejudice to the public caused by the unavailability of the comments from the state agencies. . . .* It was impossible for the trial court to know what effect these expert criticisms would have had on public comments, presentations and official reaction. Its independent judgment that the information was of 'no legal significance' amounts to a

---

[37] The State Clearinghouse in the Office of Planning and Research is "responsible for distributing environmental documents to State agencies, departments, boards, and commissions for review and comment." (Guidelines, § 15023, subd. (c).)

'*post hoc* rationalization' of a decision already made, a practice which the courts have roundly condemned." (*Id.* at p. 1021, fourth italics added, all other italics in original; see *No Oil, supra,* 13 Cal.3d at p. 81.)

Thus, the *Rural Landowners* court held that, where the "failure to comply with the law results in a subversion of the purposes of CEQA by omitting information from the environmental review process, the error is prejudicial. The trial court may not exercise its independent judgment on the omitted material by determining whether the ultimate decision of the lead agency would have been affected had the law been followed. The decision is for the discretion of the agency, and not the courts." (*Rural Landowners, supra,* 143 Cal.App.3d at p. 1023.)

As noted, our high court in *EPIC* agreed with the foregoing analysis, discussing *Rural Landowners* with approval and citing the case for the proposition that "courts are generally not in a position to assess the importance of the omitted information to determine whether it would have altered the agency decision, nor may they accept the post hoc declarations of the agencies themselves." (*EPIC, supra,* 44 Cal.4th at p. 487.) Indeed, this reasoning was a crucial underpinning for the Supreme Court's ultimate holding that "it is the burden of the agency that erroneously omitted the comments to establish they are merely duplicative" or otherwise insignificant. (*Id.* at p. 488; see also *Sierra Club v. State Bd. of Forestry* (1994) 7 Cal.4th 1215, 1236–1237 [citing *Rural Landowners* with approval, holding that when omission of legally required information makes "any meaningful assessment of the potentially significant environment impacts"

of a project and the development of mitigation measures "impossible," "prejudice is presumed"].)

    *Fall River* is also instructive. The reviewing court in that case considered whether the failure to notify a trustee agency of the intent to adopt a mitigated negative declaration constituted a prejudicial abuse of discretion under section 21005—a provision of CEQA enacted a year after *Rural Landowners*, codifying that opinion's central holding. (*Fall River, supra,* 70 Cal.App.4th at pp. 491–492.)[38] The lead agency argued "the discretionary word 'may' and the statement 'there is no presumption that error is prejudicial' " in section 21005 meant "*the plaintiffs must adduce evidence of a specific prejudice* flowing from the failure to give the required notice" in order to establish a prejudicial abuse of discretion under the statute. (*Fall River,* at p. 492, italics added.) The reviewing court disagreed. Anticipating our high court's later holding in *EPIC*, the *Fall River* court explained: "The addition of the discretionary language [in section 21005] does no more than recognize there are circumstances in which the failure to give notice would not be prejudicial. For example, if the [trustee agency] had appeared at the first hearing in this

---

38    Section 21005 provides, in relevant part: "[N]oncompliance with the information disclosure provisions of [CEQA] which precludes relevant information from being presented to the public agency, or noncompliance with substantive requirements of [CEQA], may constitute a prejudicial abuse of discretion . . . regardless of whether a different outcome would have resulted if the public agency had complied with those provisions." (§ 21005, subd. (a).) At the same time, the statute reaffirms that, "in undertaking judicial review pursuant to [CEQA], courts shall continue to follow the established principle that there is no presumption that error is prejudicial." (*Id.*, subd. (b).)

case and voiced no concerns it could be said the failure to give notice of the succeeding negative declaration was not prejudicial. But where *the lack of notice*, as here, *results in a failure to elicit a response* to the negative declaration, *the prejudice is manifest*." (*Ibid.*, italics added, fn. omitted; accord *EPIC, supra,* 44 Cal.4th at p. 487 & fn. 10 [noting appellate court "case law is consistent with the standard of prejudice" found in section 21005, which is " 'simply a reminder of the general rule that errors which are insubstantial or de minimis are not prejudicial,' " and holding "the agency that failed to consider the comments would have the burden" of showing omitted information was insubstantial].)

As in *EPIC*, *Rural Landowners*, and *Fall River*, Metro's admitted violation of CEQA's procedural mandates may well have deprived the lead agency and the public of information necessary to informed decisionmaking. The law directs that, upon receipt of a timely notice of preparation (which Metro admits it did not provide), a trustee agency "shall" respond "in writing" to the lead agency within 30 days and "specify to the lead agency the scope and content of the environmental information that is germane to the statutory responsibilities" of the trustee agency.[39] (§ 21080.4, subd. (a).) At "a minimum,"

---

[39] Underscoring the mandatory nature of the trustee agency's response, the Guidelines provide a sample notice of preparation that expressly advises the receiving trustee agency of its deadline to respond. (See Guidelines, § 15082, subd. (a)(2); *id.,* Appen. I [advising, "Due to the time limits mandated by State law, your response must be sent at the earliest possible date but not later than 30 days after receipt of this notice."].) Consistent with this guidance, the notice of preparation that Metro sent to all trustee agencies—except the Conservancy—set forth a "**COMMENT DUE DATE**" for the agencies to provide

110

the trustee agency's written response "shall identify" the "significant environmental issues and reasonable alternatives and mitigation measures that the . . . trustee agency . . . will need to have explored in the draft EIR."  (Guidelines, § 15082, subd. (b)(1)(A).)  Upon receipt of the mandatory response, the lead agency "shall" include the information provided by the trustee agency in the EIR.  (§ 21080.4, subd. (a).)  It is undisputed that, despite these statutory mandates, Metro failed to obtain information from the Conservancy to include in the EIR.

After the draft EIR is completed, the Guidelines (consistent with CEQA's mandates) direct that the lead agency "shall consult with and request comments" on the report from trustee agencies "with resources affected by the project."  (Guidelines, §15086, subd. (a)(2); accord § 21104.)  Then, "[p]rior to the close of the public review period," a "trustee agency which has identified what that agency considers to be significant environmental effects shall advise the lead agency of those effects" and "shall either submit to the lead agency complete and detailed performance objectives for mitigation measures addressing those effects or refer the lead agency to appropriate, readily available guidelines or reference documents concerning mitigation measures."  (Guidelines, § 15086, subd. (d).)  Under CEQA, the lead agency is *not* required to respond to comments from a trustee agency that are submitted after the statutorily

"[w]ritten comments on the scope of the Draft EIR, including the Project area and description, the impacts to be evaluated, and the methodologies to be used in the evaluation."  In contrast, as we discuss below, neither of the late notices to the Conservancy specified a deadline for the trustee agency to respond or explained the need for consultation.

mandated comment period, nor is the agency required to reopen the comment period or delay acting on an EIR due to the submission of a late comment.  (§ 21092.5, subd. (c); accord § 21168.6.9, subd. (e)(6); see also § 21091.)  It is undisputed that Metro did not request to consult with the Conservancy before the close of the Project's public review period.

Respondents nevertheless maintain Metro's failure to comply with CEQA's notice and consultation mandates did not prejudice the environmental review process because Metro sent the Conservancy "two direct notices" about the Project— the first six months before the final EIR's completion and the second two months before the report's certification—but the Conservancy "neither commented nor expressed any concerns or interest in consulting."  Respondents argue these notices prove that the Conservancy "was given ample opportunity to present 'relevant information' to Metro" and that "the timing of such notice did not 'preclude' [the trustee agency] from doing so."  Thus, respondents insist there is no prejudice under CEQA.  (See § 21005, subd. (a).)  We are not convinced.

The problem with respondents' argument is the Conservancy's silence leaves considerable uncertainty about why the trustee agency failed to comply with its *mandatory* duty to provide information "germane to [its] statutory responsibilities" as a public agency having jurisdiction over natural resources held in trust for the people of this state.  (§ 21080.4, subd. (a).)  Critically, the law anticipates there may be times when a trustee agency does not respond to a request for consultation, notwithstanding its statutory obligation to do so.  Thus, the Guidelines specify conditions under which a lead agency may assume—as respondents urge us to do here—

112

that the trustee agency has no material information to provide: "If any public agency or person who is consulted with regard to an EIR . . . fails to comment within a reasonable time *as specified by the lead agency*, it shall be assumed, absent a request for a specific extension of time, that such agency or person has no comment to make." (Guidelines, § 15207, italics added.)

Neither of Metro's late communications to the Conservancy specified a time for the trustee agency to respond or even indicated what purpose the consultation would serve. The earliest notice—an email sent to the Conservancy's general information account five months *after* the public review period closed—simply attached the notice of completion of the draft EIR and requested that the recipient, "Please let us know if you wish to consult on the proposed Project." The second notice— a distribution through the State Clearinghouse upon completion and publication of the final EIR—did not request a response, let alone invite the Conservancy to consult on the completed final report. On this record, even if we could overlook Metro's failure to send the mandatory notice of preparation at the beginning of its environmental review, we cannot reasonably assume the Conservancy had no material information to provide, especially given the Project's significant impacts on LASHP and other trust resources. (Cf. *Citizens for East Shore Parks v. State Lands Com.* (2011) 202 Cal.App.4th 549, 568 [where lead agency sent the draft EIR with notice requesting "comments within 45 days" it was reasonable to assume under section 15207 of the Guidelines that trustee agencies had no information to provide].)

Relying on *San Francisco Baykeeper, Inc. v. State Lands Com.* (2015) 242 Cal.App.4th 202 (*Baykeeper*) and *Schenck v. County of Sonoma* (2011) 198 Cal.App.4th 949 (*Schenck*),

113

Metro argues prejudice has not been established, because petitioners have offered "no evidence that any failure to notify the Conservancy led Metro to overlook material information." As we have discussed, because Metro's violations have resulted in the failure to elicit a response from the Conservancy and, thus, potentially deprived the lead agency of information necessary to informed decisionmaking and public participation, the prejudice here is manifest, and the burden rests with *Metro* to show the potentially omitted information would have been insubstantial or de minimis. (*EPIC, supra,* 44 Cal.4th at pp. 486–487; *Rural Landowners, supra,* 143 Cal.App.3d at p. 1023; *Fall River, supra,* 70 Cal.App.4th at p. 491.) Contrary to Metro's argument, it is not petitioners' burden to adduce evidence of a "specific prejudice" flowing from the failure to obtain the required response. (*Fall River,* at p. 492; accord *EPIC,* at pp. 486–487.)

*Baykeeper* is admittedly difficult to square with our Supreme Court's holding in *EPIC*, which—despite having been decided nearly a decade earlier—goes entirely unmentioned in the appellate court's opinion. The petitioner in *Baykeeper* challenged the approval of a project to dredge mine sand from under the San Francisco Bay, arguing the lead agency failed to consult with a trustee agency—the California Coastal Commission—before certifying the final EIR. (*Baykeeper, supra,* 242 Cal.App.4th at p. 228.) Although the Coastal Commission had received a copy of an earlier draft EIR and submitted no comments, the record showed the trustee agency did not receive a revised draft EIR that "contained indisputably significant new information about coastal erosion, the very impact that affected its jurisdiction." (*Id.* at p. 230.) The *Baykeeper* court concluded the lead agency "violated CEQA

114

requirements designed to ensure that it consult with affected agencies," but held the *petitioner's* "failure to demonstrate that these violations resulted in the omission of pertinent information from the environmental review process" required a finding that no prejudice occurred.  (*Id.* at p. 232.)  In reaching this conclusion, the *Baykeeper* court did not consider (or even cite) our Supreme Court's holding in *EPIC*, which recognized that "comments from state agencies . . .  may contain information critical to [the environmental review] process" and, therefore, when a lead agency's violation results in their omission, "it is the burden of *the agency* that erroneously omitted the comments to establish they are merely duplicative" or otherwise immaterial.  (*EPIC, supra,* 44 Cal.4th at pp. 486, 488, italics added.)  Because we cannot reconcile the *Baykeeper* holding with this controlling Supreme Court precedent, we are compelled to disregard the appellate court's opinion on this point.  (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

*Schenck*, on the other hand, is an instructive example of a case where the lead agency unquestionably met its burden to show its violation did not prejudice the environmental review process.  The petitioner there challenged the approval of a project for the development of a beverage distribution facility, arguing the lead agency failed to give proper notice to a responsible agency—the Bay Area Air Quality Management District (BAAQMD)—of the intent to adopt a final mitigated negative declaration.  (*Schenck, supra,* 198 Cal.App.4th at pp. 952, 955–956.)  The record showed that, upon determining an initial study was required, the lead agency provided notice and solicited comments on the project from BAAQMD.  (*Id.* at pp. 956–957.)  BAAQMD did not respond, but in the mitigated negative

115

declaration, the lead agency adopted BAAQMD's published CEQA guidelines and found the project had no features that would conflict with BAAQMD's air quality plan. (*Id.* at p. 957.) In the litigation that followed, the trial court found that the lead agency failed to furnish proper notice of the intent to adopt the mitigated negative declaration to BAAQMD and that the lead agency "failed to 'show lack of prejudice' associated with the defective notice, despite the incorporation of [BAAQMD's] 'standards' and 'thresholds of significance' into the mitigated negative declaration." (*Id.* at pp. 955–956; see *EPIC, supra,* 44 Cal.4th at p. 487.) Accordingly, the trial court issued a writ of mandate directing the real party in interest "to provide adequate notice to the BAAQMD, with the 'results of such notice' to determine the 'further course of action' needed to 'cure the defects and ensure proper CEQA review of this project.' " (*Schenck,* at p. 956.) BAAQMD responded to the notice with comments confirming the air quality analysis met " 'appropriate standards for impact assessment' "; the project's " 'estimated operational criteria emissions are below [BAAQMD's] existing thresholds of significance' "; and BAAQMD " 'supports the adopted mitigation measures as a means to implement all feasible measures to reduce the Project's emissions.' " (*Ibid.*) The lead agency then filed what amounted to a return on the writ, and the trial court issued a final judgment, from which the petitioner appealed. (*Ibid.*)

Unsurprisingly, the reviewing court in *Schenck* found this series of events demonstrated that, notwithstanding the lead agency's failure to send notice to BAAQMD, "the information gathering and presentation mechanisms of CEQA were not subverted or even compromised." (*Schenck, supra,* 198

116

Cal.App.4th at p. 960.)  The court explained that, after BAAQMD did not respond to the notice of initial study, the lead agency "assumed the role of the BAAQMD by implementing the published CEQA quantitative criteria in the initial study" to determine the project would not result in emissions exceeding BAAQMD's significance thresholds.  (*Ibid*.)  And, because the trial court had issued a writ requiring notice to BAAQMD, the record showed that "after review of the notice of intent to adopt the revised mitigated negative declaration the BAAQMD confirmed that the project's 'estimated operational criteria emissions are below the Air District's existing thresholds of significance.' "  (*Ibid*.)  In effect, the record demonstrated that "the omitted material support[ed] the agency action that was taken," and the lead agency thus met its burden to show the omission did not subvert CEQA's public comment provisions. (*EPIC, supra,* 44 Cal.4th at p. 487.)

Needless to say, in this case, the trial court did not issue a writ requiring Metro to give proper notice to the Conservancy and, although Metro eventually contacted the trustee agency after the public review period had closed, Metro did not specify a time for the Conservancy to respond to the request for consultation as required under section 15207 of the Guidelines. Due to these procedural violations, we cannot appropriately infer what information the trustee agency would have provided to protect its trust resources, nor can we know what effect its expert insights would have had on the environmental review. (See *Rural Landowners, supra,* 143 Cal.App.3d at p. 1021; accord *EPIC, supra,* 44 Cal.4th at p. 487.)

Respondents rightly note that the EIR analyzed significant construction noise impacts to the Conservancy's resources;

117

however, we have found the report's assessment of measures to mitigate these significant impacts was deficient.  " ' "[P]ublic review and comment . . . ensures that appropriate alternatives and mitigation measures are considered, and permits input from agencies with expertise" ' " relevant to environmental impacts. (*EPIC, supra,* 44 Cal.4th at p. 486.)  We agree with petitioners that, with proper notice, the Conservancy could have proposed additional mitigation measures for noise impacts to LASHP and El Pueblo beyond those set forth in mitigation measure NOI-A. (See Guidelines, § 15082, subd. (b); see also § 21104, subd. (a); Guidelines, § 15086, subd. (d).)  Metro's failure to elicit a response potentially deprived the lead agency of information necessary to informed decisionmaking and public participation. The error subverted the purpose of CEQA's public review and consultation process.  It was therefore prejudicial.  (See *EPIC*, at pp. 486–487.)

## DISPOSITION

The judgment is reversed. The matter is remanded to the trial court with directions to vacate its order denying the petitions for writ of mandate and to enter a new order that grants the writ of mandate directing Metro to (1) set aside its certification of the EIR; (2) set aside its adoption of the mitigation monitoring and reporting program; (3) set aside its adoption of CEQA findings and a statement of overriding considerations; (4) set aside its approval of the Project; (5) comply with CEQA by undertaking review of measures to mitigate the Project's significant construction noise impacts consistent with the views expressed in this opinion; (6) comply with CEQA by requesting consultation with the Santa Monica Mountains Conservancy specifying a reasonable time within which the trustee agency

must respond in accordance with sections 21080.4 and 21104; and (7) prepare and certify a legally sufficient supplemental EIR incorporating the information developed through this corrective action before taking further steps to reapprove the Project.

Because The California Endowment has prevailed on issues raised in its appeal, it is entitled to an award of costs. Los Angeles Parks Alliance shall bear its own costs.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EGERTON, J.

We concur:

EDMON, P. J.

ADAMS, J.